UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re

ANMUTH HOLDINGS LLC,

                       Alleged Debtor.

-------------------------------------------------------------x

In re

QUEST FUNDING LLC,

                       Alleged Debtor.

-------------------------------------------------------------x

Chapter 7 (Involuntary)

Case No. 18-43216-CEC

Chapter 7 (Involuntary)

Case No. 18-43272-CEC

<u>DECISION</u>

APPEARANCES:

    Paul A. Rubin, Esq.
    Hanh Huynh, Esq.
    Rubin LLC
    345 Seventh Avenue
    New York, NY 10001
    *Attorneys for Alleged Debtors*

    Scott Markowitz, Esq.
    Michael Z. Brownstein, Esq.
    Tarter Krinsky & Drogin LLP
    1350 Broadway
    New York, NY 10018
    *Attorneys for Petitioning Creditors: Abraham Leser, Chaim Miller, and Sam Sprei*

CARLA E. CRAIG
Chief United States Bankruptcy Judge

This case concerns abuse of the power given to creditors in 11 U.S.C. § 303 to file an involuntary bankruptcy petition.   As the Second Circuit recently noted,

> Involuntary bankruptcy petitions help ensure the orderly and fair distribution of an estate by giving creditors an alternative to watching nervously as assets are depleted, either by the debtor or by rival creditors who beat them to the courthouse.  Despite these benefits, involuntary bankruptcy petitions have "serious consequences [for] the alleged debtor, such as loss of credit standing, inability to transfer assets and carry on business affairs, and public embarrassment."  "By giving creditors the ability to bring a debtor into bankruptcy, Congress created a power that could be abused."  "Such a remedy exists as an avenue of relief for the benefit of the overall creditor body.... [It] was not intended to redress the special grievances, no matter how legitimate, of particular creditors .... [Such creditors] must seek redress under state law, in the state courts[,] and not in the bankruptcy court."

Wilk Auslander LLP v. Murray (In re Murray), 900 F.3d 53, 59–60 (2d Cir. 2018) (alterations in original) (citations omitted).

Hours after receiving an adverse decision in state court, denying a request for a stay pending appeal of a draw on letters of credit, Sam Sprei ("Sprei"), Abraham Leser ("Leser"), and Chaim Miller ("Miller") (the "Petitioning Creditors") filed involuntary chapter 7 petitions against Anmuth Holdings, LLC ("Anmuth") and Dupont Street Developers, LLC ("Dupont Developers") for the purpose of invoking the automatic stay to prevent the drawdown of the letters of credit that the state court had refused to stay.[1]  Four days later, the Petitioning Creditors filed a Chapter 7 involuntary petition against Quest Funding LLC ("Quest").[2]  Joseph Brunner is the principal of Anmuth, Dupont Developers, and Quest.  After Anmuth and Quest (the "Alleged Debtors") moved to dismiss the involuntary petitions against them (the "Involuntary Petitions"), seeking sanctions in the form of attorneys' fees and costs, compensatory damages, and punitive damages, pursuant to 11 U.S.C. §§ 303(i) and 105 (the "Sanctions Motion"), the Petitioning Creditors

---

[1] In re Anmuth Holdings, LLC, No. 18-43216-cec (Bankr. E.D.N.Y. filed May 31, 2018); In re Dupont Street Developers, LLC, No. 18-43217-cec (Bankr. E.D.N.Y. filed May 31, 2018).

[2] In re Quest Funding, LLC, No. 18-43272-cec (Bankr. E.D.N.Y. filed June 4, 2018).

conceded that their purported claims against the Alleged Debtors were subject to a bona fide dispute and that as such, they were ineligible to file the Involuntary Petitions.[3]  In dismissing the petitions against the Alleged Debtors, the Court retained jurisdiction to consider the Sanctions Motion.[4]  An evidentiary hearing was held on the Sanctions Motion on October 30 and October 31, 2018.[5]

## I.    JURISDICTION

This Court has jurisdiction of this proceeding pursuant to 28 U.S.C. § 1334(b), and the Eastern District of New York standing order of reference dated August 28, 1986, as amended by order dated December 5, 2012.  This matter is a core proceeding under 28 U.S.C § 157(b)(2)(A) and (O).  This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Federal Rule of Bankruptcy Procedure 7052.

## II.    BACKGROUND

### A.  Facts

The parties to these proceedings are involved in the purchase and sale of real estate in the New York City area, have known each other for many years, and share an extensive state court litigation history.

---

[3] The Dupont Developers involuntary chapter 7 petition was dismissed on July 31, 2018 for failure to prosecute with no subsequent hearings.  (Dismissal Order, No. 18-43217-cec, ECF No. 17.)

[4] The Quest petition was dismissed by order dated August 13, 2018.  (Dismissal Order, No. 18-43272-cec, ECF No. 14.)  The Anmuth petition was dismissed by order dated August 15, 2018.  (Dismissal Order, No. 18-43216-cec, ECF No. 23.)  Citations to "Anmuth ECF No. []" are to documents filed in Case No. 18-43216-cec, identified by docket entry number, and citations to "Quest ECF No. []" are to documents filed in Case No. 18-43272-cec, identified by docket entry number, unless otherwise indicated.

[5] References to the transcript of the October 30, 2018 and October 31, 2018 hearings are identified as "10/30 Tr." and "10/31 Tr."  (respectively, Anmuth ECF No. 38 and 40.)

The following facts are either conceded by the Petitioning Creditors or were established

at trial.

1.    The Parties

Joseph Brunner is a real estate developer and lender who owns or controls various entities

with real estate holdings of approximately 150 buildings, having an aggregate value in excess of

$1 billion, and is the principal of both Alleged Debtors.[6]  (10/30 Tr. (Brunner) 121:17–23,

130:14–15.)  Quest's business is private lending.  (Id. at 122:14.)  Anmuth is a holding company

that indirectly owns eighty percent of Dupont Developers, a separate entity under the control of

Brunner.[7] (Id. at 122:25–123:1; 156:4–7, 157:14–16.)

Petitioning creditor Sam Sprei ("Sprei") regularly acts on behalf of the other two

petitioning creditors with respect to a variety of business ventures.  (10/30 Tr. (Sprei)

94:22–95:1; 10/30 Tr. (Miller) 71:6–13; 10/31 Tr. (Sprei) 14:19–15:10; Deposition Transcript of

Abraham Leser ("Leser Dep. Tr.") 71:5–7, 104:16–17, 105:3–25.)[8]  Sprei makes his living

working in real estate, "syndicat[ing] deals" and managing investments.  (10/30 Tr. (Sprei)

81:11–13.)  Sprei is twenty-nine years old and has known Leser and Miller for over twenty

years.  (Id. at 81:5–82:6.)  Sprei testified that at all relevant times herein, he was "making

decisions" on behalf of his investing "group," comprised of the Petitioning Creditors.  (Id. at

---

[6] Brunner is the manager and fifty percent owner of Anmuth, and the sole owner of Quest.  (10/30 Tr. (Brunner) 122:11–12; Joint Pre-Trial Order ("JPTO") ¶ 5(A), Anmuth ECF No. 36.)

[7] The sole member of Dupont Developers is Clay Riverview, LLC.  (10/30 (Brunner) Tr. 156:4–7.)  Anmuth owns 80% of Clay Riverview, LLC.  (Id. at 157:15–16.)

[8] Petitioning creditor Leser did not testify at the hearing.  His deposition testimony was admitted into evidence.  (See Ex. 2; JPTO ¶ 13.)  The Alleged Debtors' trial exhibits are identified by number ("Ex. 1," "Ex. 1(a)," "Ex. 2," etc.) and the Petitioning Creditors' trial exhibits are identified by letter ("Ex. A," "Ex. B," etc.).

96:6−8; 10/31 Tr. (Sprei) 45:10, 64:23−25.)  Sprei grew up in the same community as Brunner

and has known him for many years.  (10/31 Tr. (Sprei) 40:8−15; 10/30 Tr. (Brunner)

125:25−126:3.)  Sprei arranged for the Involuntary Petitions to be filed.  (10/30 Tr. (Sprei)

96:6−8.)

Petitioning creditor Chaim Miller ("Miller") works for a real estate management

company owned by Leser.  (10/30 Tr. (Miller) 70:7−19.)  Miller has over twenty years'

experience investing in real estate (10/31 Tr. (Miller) 79:20−22.)  Some of Miller's investments,

while held in his name, are funded by Leser, with Leser holding an interest.  (10/30 Tr. (Miller)

71:14−20.)  Miller is indebted to Leser for more than $8 million.  (Id. at 72:12−19.)  Miller has

known Brunner for nearly thirty years, since Brunner was "very young."  (10/31 Tr. (Miller)

66:5−10; 10/30 Tr. (Brunner) 125:19−24.)

Petitioning creditor Abraham Leser ("Leser") has been investing in real estate for

approximately forty-five years and runs The Leser Group, a business that owns, leases, and

manages real estate.  (Leser Dep. Tr. 8:10−12, 10:7−10, 11:3−7.)  Although Leser's testimony

was evasive, it is clear that he has been very successful in commercial real estate and has raised

millions of dollars investing in the Israeli bond market.  (Id. at 13−17; 10/30 Tr. (Brunner)

124:3−11.)  Leser has known Brunner "[s]ince he's a baby," for "close to 30 years," and they

have worked together in the past.  (Leser Dep. Tr. 109:2−8; 10/30 Tr. (Brunner) 123:21−124:15.)

Brunner, Sprei, Miller, and Leser attended the same synagogue in Brooklyn.  (10/30 Tr.

(Miller) 71:4−5; (Sprei) 81:17−19, 105:21−24; 10/31 Tr. (Sprei) 40:14−15; (Miller) 66:9−10;

Leser Dep. Tr. 22:3−8, 109:2−8.)

2.  <u>The Dupont Street Property, The Letters of Credit, and the L/C Agreement</u>[9]

The parties' dispute arises from the purchase and sale of 49 Dupont Street, Brooklyn,

New York (the "Dupont Street Property").  Under a contract of sale dated June 8, 2012 (the

"Contract of Sale"), Brunner's company, Dupont Developers, agreed to purchase the Dupont

Street Property from 49 Dupont Realty Corp. for approximately $20 million.  (JTPO ¶ 5(C); Ex.

A (Contract of Sale); 10/30 Tr. (Brunner) 175: 9–24.)  The Contract of Sale prohibited

assignment, and for this reason subsequent transfers of the rights under the Contract of Sale were

effectuated by the sale of the membership interest in the purchaser, Dupont Developers.  (10/30

Tr. (Brunner) 157:20–158:8.)  Certain environmental conditions present at the Dupont Street

Property resulted in an order on consent and administrative settlement with the New York State

Department of Environmental Conservation ("NYSDEC"), pursuant to which the seller, 49

Dupont Realty Corp., was required to take several actions, including a remediation program.

(JPTO ¶ 5(D).)  Under the Contract of Sale, Dupont Developers agreed to assume 49 DuPont

Realty Corp.'s obligations under the NYSDEC consent order.   (JPTO ¶ 5(E).)

In June 2013, Brunner entered into a contract to sell the rights to purchase the Dupont

Property to 49 Duponts Lofts, an entity owned by Miller (the "June 2013 Contract").  (Ex. B;

10/31 Tr. (Miller) 63:20–22.)  At the time of the June 2013 Contract, a separate Brunner entity

held the contract rights, through ownership of Dupont Developers, to purchase the Dupont

Property.  (Ex. B; 10/30 Tr. (Brunner) 155:17–24.)  Through a series of transfers, Anmuth

obtained the right to purchase under the Contract of Sale and was substituted as "Assignor" in

---

[9] While the trial testimony addressed various dealings and transactions between the parties, and transfers and
assignments of interests in the entities purchasing the Dupont Street Property, the Involuntary Petitions were
premised on claims relating to the cash collateral pledged to secure standby letters of credit issued for the account of
Dupont Developers (the "SLOC claim") and the statement of facts in this decision focuses on those facts pertinent to
the SLOC claim.

the June 2013 Contract with 49 Dupont Lofts.  (10/31 (Brunner) 156:9−16, 166:12−15.)

Although the exact amount is disputed, all parties testified that certain payments were made by

49 Dupont Lofts to Brunner (or one of his entities) under the June 2013 Contract.  Brunner

testified that he received "more than $2.5 million."  (10/30 Tr. (Brunner) 162:19−20.)  Miller and

Sprei testified that they made several payments totaling "close to five million dollars."  (10/31

Tr. (Sprei) 16:8−11, (Miller) 64:13−16.)  In January 2014, the June 2013 Contract was

terminated and the parties to the June 2013 Contract reached an alternative agreement.[10]

The sale of the Dupont Street Property closed on May 19, 2014.  (JPTO ¶ 5(F).)  At

closing, in order to ensure their performance under the NYSDEC consent order, Dupont

Developers agreed to provide standby letters of credit ("SLOCs") in favor of the seller, 49

Dupont Realty Corp., and to maintain the SLOCs until the remediation work was completed and

a certificate of completion was issued by NYSDEC.  (JPTO ¶ 5(E).)  Brunner testified that,

> The letter[s] of credit[ ] were put into place for the benefit of the seller of
> the property to guarantee him that the environmental liability that exists on th[e]
> property will properly be cleaned and there will be a letter of no further action
> from the [NYCDEC]…
> [T]here were two mechanisms how the money of the letter[s] of credit
> [were] going to be utilized.  Either Dupont Street Developers would clean up the
> property and the funds would be drawn down for the physical clean up and there
> was an agreement controlling how the funds were going to flow to clean it up.
> What benchmarks need to be met and -- for the clean up.
> Or if Dupont Street Developers, LLC defaults on the clean up,…the seller
> of the property, had a right to draw and take away the letter of credit and take
> away those funds in order to protect him from the liability….

 (10/30 Tr. (Brunner) 178:13−179:5.)  Three SLOCs were issued by Investors Bank for the

account of Dupont Developers in favor of 49 Dupont Realty Corp. in the aggregate amount of

$4.7 million.  (JPTO ¶ 5(E).)  Investors Bank received cash collateral in the amount of

---

[10] All parties acknowledge that additional agreements were entered into, although they dispute the nature and terms
of those agreements.  This decision addresses only the facts and contentions relevant to the claims asserted on the
Involuntary Petitions.

$4,770,550 posted by Brunner or one of his entities (the "Cash Collateral"), and a personal guaranty from Brunner, to secure the SLOCs.  (Id.)  The SLOCs were originally set to expire on May 20, 2015, but were extended for additional one-year periods in 2015, 2016 and 2017, with the final extension expiring on May 20, 2018.  (JPTO ¶ 5(F).)

Subsequent to the closing, on September 18, 2014, Brunner, on behalf of Anmuth, executed an "Agreement Regarding Letter of Credit" (the "L/C Agreement"), providing that in the event the Cash Collateral is returned to Anmuth, "Miller shall be entitled to… $4,353,500."[11] (JPTO ¶ 5(G).)  The L/C Agreement recites that "Miller has an interest in the funds used as collateral for the Letters of Credit."[12]  (Id.)  Leser and Sprei are not parties to the L/C Agreement.  (See Ex. 1(d).)

Brunner testified that the L/C Agreement was executed the same day that he, Sprei, Leser, and Miller "completed a long line of transaction" and Brunner was requesting a "full blown general release" from the Petitioning Creditors.  (10/30 Tr. (Brunner) 179:9−15.) According to Brunner, at that meeting, Miller made a "personal request" of him, as Miller "was having a difficult time financially…."  (Id. at 179:16−19.)  Brunner testified that Miller "asked…what if something does happen and [the Cash Collateral] does come to you?  Do you agree that you'll give me that money?"  (Id. at 179:24−180:1.)  Brunner testified that in order to secure the release, and because he knew that "in no event does this money ever com[e] to me," he agreed to the L/C Agreement.  (Id. at 179:19−180:6.)

---

[11] This amount represents the amount of the Cash Collateral less fees and other costs.  (JPTO ¶ 5(E).)

[12] The L/C agreement states in paragraph "A" of the recitals, "Dupont Street Developers LLC is the beneficiary under the three Letters of Credit…."  (JPTO ¶ 5(G).)  According to Brunner, this was in error, and the L/C Agreement "should have said [Dupont Developers] is the applicant," and the seller, 49 Dupont Realty Corp., the beneficiary.  (10/30 Tr. (Brunner) 177:16−178:3.)

Miller testified that the alleged $5 million he paid to Brunner was used to fund the Cash

Collateral securing the SLOCs.  (10/31 Tr. (Miller) 67:11–68:4.)  Miller testified that,

> [Brunner] told me that we should give him the money for the [SLOCs].  And I
> put it up for him.

> Q.  …And did you believe that based upon that transaction and this agreement,
> that that money that was secured at Investors Bank, was money belonging to
> you?

> A.  Correct.

(10/31 Tr. (Miller) 67:17–68:4.)

3.  <u>State Court Litigation</u>[13]

On October 19, 2015, Miller commenced an action against Anmuth in state court (the

"2015 Action"), asserting that he loaned Brunner the money to fund the Cash Collateral for the

SLOCs, and that because the SLOCs had expired and the Cash Collateral had been released to

Anmuth, "all of the preconditions for repayment of an amount totaling $4,353,500.00 to Miller,

pursuant to the [L/C Agreement] have been satisfied."  (JPTO ¶ (5)(I).)  Miller commenced a

second action in state court in 2018 (the "2018 Action"), premised on the same underlying facts

as the 2015 Action, adding new claims and additional defendants, including Investors Bank and

49 Dupont Realty Corp.  (JPTO ¶ 5(K).)[14]

In 2016 and 2017, Miller unsuccessfully sought preliminary injunctions to enjoin

Brunner, Anmuth, and any other entity acting in concert with them, from renewing the SLOCs.

(<u>See</u> Ex. 1(e) at 3 (May 29, 2018 State Court Decision).)  On May 3, 2018, the court in the 2015

---

[13] This section sets forth a synopsis of the proceedings in state court, highlighting the relevant facts solely as they relate to the filing of the Involuntary Petitions.

[14] <u>Miller v. Anmuth</u>, No. 512723/2015 (N.Y. Sup. Ct. Kings Cnty. filed Oct. 19, 2015) (<u>See</u> Mot. to Dismiss, Ex. C (2015 State Court Action Summons and Complaint), Anmuth ECF No. 10); <u>Miller et al v. Brunner et al</u>, No. 509929/2018 (N.Y. Sup. Ct. Kings Cnty. filed May 14, 2018) (<u>See</u> Mot. to Dismiss, Ex. H (2018 State Court Action Complaint), Anmuth ECF No. 10.)

Action, upon Miller's emergency application and an emergency application filed by Brunner in response, issued a temporary restraining order ("TRO"), "restraining any party, entity or person from drawing down on the letters of credit."[15]  (Id.)  On May 16, 2018, the state court held a combined hearing as to the continuation of the TRO issued in the 2015 Action and Miller's application for a TRO and preliminary injunction in the 2018 Action.  By order dated May 16, 2018, the court vacated the TRO issued in the 2015 Action, denied the TRO sought in the 2018 Action, and scheduled a hearing for May 23, 2018.  (Id. at 4.)  On May 18, 2018, in the 2018 Action, Miller moved by emergency application seeking reargument of the May 16, 2018 Order and a stay of the expiration of the SLOCs.  (Id.)  On May 18, 2018, a TRO was granted in the 2018 Action pending the May 23, 2018 hearing date.  (Id.)

By Decision and Order dated May 29, 2018 in the 2018 Action (the "5/29 Decision"), the state court denied Miller's request to restrain the drawdown on the SLOCs and to restrain any disposition of the Cash Collateral on the following grounds: (i) Miller is neither party to, nor a beneficiary of, the SLOCs and has no relationship, contractual or otherwise, with Investors Bank or 49 Dupont Realty Corp.; (ii) although acknowledging the existence of Miller's claim, the court found that the L/C Agreement "only proves that Miller has a contingent entitlement to much of the collateral and that entitlement is triggered when the collateral is returned to Anmuth," which "triggering event has not occurred;" and (iii) any harm that could result from Investors Bank's payment on the SLOCs is purely monetary and thus does not constitute irreparable harm.  (Ex. 1(e) (5/29 Decision).)  Additionally, the court ordered that the previously imposed order temporarily restraining the drawdown of the SLOCs would be vacated effective May 31, 2018.  (Id.)

---

[15] Two TROs were issued in the 2015 Action, on May 2, 2018 and May 3, 2018, with the net effect that any and all parties were restrained from drawing down on the SLOCs.  (Ex. 1(e) at 3 (May 29, 2018 State Court Decision).)

Miller appealed the 5/29 Decision, and on May 31, 2018 filed a motion for a stay pending appeal with the New York Supreme Court, Appellate Division, Second Department (the "Appellate Court").  (JPTO ¶ 5(M).)  At approximately 4:00 p.m. on May 31, 2018, the Appellate Court denied Miller's request for a stay pending appeal.  (Ex. 1(f).)

Petitioning Creditors admit that had an injunction been granted in the 5/29 Decision, or had the Appellate Court granted a stay of the 5/29 Decision pending appeal, they would not have filed the Involuntary Petitions.  (10/30 Tr. (Sprei) 99:18−22.)

4.    The Involuntary Petitions

On May 31, 2018, immediately after failing to obtain a stay from the Appellate Court, Sprei met and retained Douglas Pick, Esq. ("Pick"), for the purpose of filing involuntary petitions against Anmuth and Dupont Developers.  (JPTO ¶ 5(N).)  Sprei was the sole petitioning creditor present at the meeting with Pick.  (JPTO ¶ 5(O).)  Pick testified that on the evening of May 31, 2018, while Sprei was in his office, he spoke with Miller and Leser by telephone. (10/30 Tr. (Pick) 16:25−17:1.)  Pick testified that he explained to all three Petitioning Creditors the requirements necessary to file an involuntary petition and confirmed with each of them (i) that their claim was valid, undisputed, and non-contingent; and (ii) that Anmuth was not generally paying its debts as they become due.  (Id. at 17:3−9, 19:21−24.)  Pick further testified that he warned each Petitioning Creditor of the risks, including potential sanctions, associated with filing an involuntary petition.  (Id. at 16:7−17:25, 19:21−22:9, 26:19−20.)  Leser and Miller deny speaking with Pick and testified that on May 31, 2018, they only spoke with Sprei regarding the Involuntary Petitions.  (10/31 Tr. (Miller) 72:3−4; Leser Dep. Tr. 90:19−94:6.)  All parties agree that Sprei, with authorization, was making decisions on behalf of the Petitioning

Creditors.  (10/30 Tr. (Pick) 16:15, 21:3–4, (Miller) 73–74, (Sprei) 84, 95:13–15, 96:6–8, 120;

Leser Dep. Tr. 39:10–24, 49:5–14; 10/31 Tr. (Miller) 71:19–25.)

At approximately 9:00 p.m. on May 31, 2018, on behalf of the Petitioning Creditors, Pick

filed involuntary chapter 7 petitions against Anmuth (see Invol. Pet., Anmuth ECF No. 1), and

Dupont Developers (see Invol. Pet., No. 18-43217-cec, ECF No. 1).[16]  (JPTO ¶ 5(P)).  Sprei

testified that the purpose of the filings against Anmuth and Dupont Developers was to prevent

Investors Bank from transferring the Cash Collateral.  (10/30 Tr. (Sprei) 83:18–20, 98:21–25.)

He further testified that after filing the petitions against Anmuth and Dupont Developers, his

attorneys contacted him and advised "that the money was transferred and being held through an

account called Quest, and the money's not being held by an account called Anmuth, so we

believed that only way to freeze the Quest account is to file under Quest."  (Id. at 96:24–97:10.)

On June 4, 2018, four days after the petitions were filed against Anmuth and Dupont Developers,

the Petitioning Creditors filed the involuntary chapter 7 petition against Quest.  (See Invol. Pet.,

Quest ECF No. 1.)  Although asked, Pick refused to sign or file the Quest petition.  (JPTO ¶

5(R); 10/30 Tr. (Pick) 35:9–36:1.)  Sprei filed the petition in person at the Bankruptcy Court.

(10/30 Tr. (Sprei) 96:17–19.)  The Petitioning Creditors did not serve any of the three

involuntary petitions.  (10/30 Tr. (Pick) 31:17–23.)

Sprei signed all three petitions on his own behalf and, with authorization, on behalf of

Leser.  (10/30 Tr. (Sprei) 84:8–11; Leser Dep. Tr. 71:5–7.)  Leser testified that he "never saw"

the petitions before they were filed, did not consult an attorney, and that the "case is run[ ] by

Miller and Sprei."  (Leser Dep. Tr. 34:24–35:18, 54:3–6, 60:21–24, 75:11–17, 104:14–105:5.)

---

[16] Pick did not sign either of the petitions against Anmuth or Dupont Developers.  (10/30 Tr. (Pick) 24:21–24; Ex. 1(a), (b).)

Miller testified that while he signed the Involuntary Petitions, he never consulted with an attorney, and he, "relied on Sam [Sprei], what Sam [Sprei] told me to do, I did." (10/30 Tr. (Miller) 74:7–15.)

The three involuntary petitions list identical claims, described as "Loan/LC," in the amounts of $4,000,000 for Leser, $250,000 for Miller, and $150,000 for Sprei. (See Ex. 1(a); Ex. 1(b); Ex. 1(c).) According to the Petitioning Creditors, these amounts represent funds the Petitioning Creditors loaned to Brunner that were used as the Cash Collateral for the SLOCs. (10/31 Tr. (Miller) 67:11–68:4.) The claims asserted in the Involuntary Petitions are the same claims that were at issue in the 2015 Action and 2018 Action in state court, and the same claims that, hours earlier, the Appellate Court had found provided no basis for a stay of the drawdown of the SLOCs.

The claims listed on the Involuntary Petitions were all subject to a bona fide dispute. (JPTO ¶ 5(S).) The Petitioning Creditors conceded at the hearing on dismissal of the Involuntary Petitions, and again at trial, that they were ineligible to file the Involuntary Petitions for this reason. (See July 24, 2018 Tr. 5:15–19, Anmuth ECF No. 21; JPTO ¶ 5(T).)

By letter dated June 4, 2018, the Alleged Debtors' counsel advised the Petitioning Creditors and Pick that they believed the Involuntary Petitions were frivolous and that they intended to vigorously oppose them. (Ex. 1(i) (the "June 4 Letter").) The Petitioning Creditors and Pick acknowledge receipt of the June 4 Letter and that they did not respond to it. (10/30 Tr. (Pick) 38:1–9, (Sprei) 104:3–8.) On June 28, 2018, the Alleged Debtors filed motions to dismiss the Involuntary Petitions and for sanctions. (Anmuth ECF No. 10; Quest ECF No. 9.)

5. <u>Post-Petition Conduct of Petitioning Creditor Sprei</u>

On multiple occasions after the Involuntary Petitions were filed, Sprei sent text messages to Brunner's business partner threatening to file an involuntary petition against Brunner individually.  (<u>See</u> Exs. 3(j)−3(l).)  For example, on July 1, 2018 at 3:01 a.m., three days after the Alleged Debtors moved to dismiss the Involuntary Petitions and for sanctions, Sprei wrote, "[w]ant to just let you know Monday I am filing in bankruptcy against [Brunner] personal and that means he can't do any more Bussines [sic] for a long time not playing around not going to waste more time…."  (Ex. 3(l).)  In another post-filing message, sent the day before Sprei's deposition on October 16, 2018, Sprei threatened, "it will become very dirty" and "verry [sic] ugly for [Brunner]."  (10/30 Tr. (Sprei) 113:13−114:5; Ex. 3; Ex. 3(m).)  Although the Petitioning Creditors commenced these bankruptcy cases, and are the plaintiffs in state court actions, Sprei made multiple efforts to compel Brunner to litigate their issues in rabbinical court.  (10/30 Tr. (Sprei) 118:8−14.)    These efforts resulted in a letter being issued by rabbis criticizing Brunner for proceeding in civil court.[17]  (<u>Id.</u> at 118:20−22.)  Sprei posted this letter on street sign poles and in synagogues in Brooklyn.  (<u>Id.</u> at 118:23−119:9.)  Additionally, he hired a company to print leaflets denouncing Brunner that were disseminated in synagogues throughout Brooklyn.  (<u>Id.</u>)

---

[17] Brunner testified that this was "due to the fact that I'm an Orthodox Jew and when an Orthodox Jew has a claim against an Orthodox Jew it cannot be in secular court, definitely not in federal court.  It belongs in a Rabbinical Court."  (10/30 Tr. (Brunner) 151:7−11.)  Brunner testified that he would not cease the proceedings in this Court or in state court because "[f]irst of all, it was hypocritical, but most importantly in order for me to clear my name I needed to have an unequivocal ruling that whatever they've done was in bad faith and it should be voided retroactively, and it should be clear for any lender or any partner or any fund or any public company that wants to continue doing business or I'm seeking to do business with that there should be a clear ruling that they should be able to see that I shouldn't have to spend time, money and effort convincing them that they should believe me that I do pay my debts when [they] comes due."  (<u>Id.</u> at 151:22−152:6.)  Brunner further testified that "[p]roving a negative is very hard, but if there's a strong and unequivocal ruling from the Court that it will speak for itself…"  (<u>Id.</u> at 156:7−10.)

**B.  Procedural Posture**

The Involuntary Petitions were filed on May 31, 2018 and June 4, 2018.  Having received

no reply to their June 4 Letter, on June 28, 2018, the Alleged Debtors filed motions to dismiss

the Involuntary Petitions and for sanctions.  (Anmuth ECF No. 10; Quest ECF No. 9.)   On July

10, 2018, Pick moved to withdraw as counsel in the Anmuth case.  (Anmuth ECF No. 12.)   A

hearing on the Dismissal Motion was held on July 24, 2018, in which the Petitioning Creditors

appeared by new counsel, Tarter Krinsky & Drogin LLP ("TKD").  At the July 24, 2018 hearing,

the Petitioning Creditors, by TKD, consented to the dismissal of the Involuntary Petitions.

(JPTO ¶ 5(W).)  On August 13, 2018 and August 15, 2018, Orders were entered in the Quest

case and Anmuth case, respectively, dismissing the Involuntary Petitions and scheduling a

hearing on the Sanctions Motion.  Hearings were held on the Sanctions Motion on October 30,

2018 and concluded on October 31, 2018, after which the parties filed post-trial briefs.


III.    DISCUSSION

**A.  Parties' Contentions**

1.  Alleged Debtors' Contentions

The Alleged Debtors contend that the Petitioning Creditors filed the Involuntary Petitions

although they were fully aware that they were ineligible to do so, as their claims were clearly

disputed, having been litigated in state court for years.  Indeed, just hours prior to the filing, the

state Appellate Court had denied the Petitioning Creditors' application for a stay.  The Alleged

Debtors further contend that the Petitioning Creditors acted maliciously, filing the Involuntary

Petitions as part of an overall strategy designed to embarrass, harass, and pressure Brunner, the

Alleged Debtors' principal, in order to coerce a settlement.  In addition to attorneys' fees and

costs, the Alleged Debtors seek compensatory damages based on Quest's lost profits as a result of the filing, and punitive damages based on the Petitioning Creditors' bad faith, including their lack of remorse and continued threats of additional involuntary filings.  The Alleged Debtors further seek an order declaring the dismissal of the Involuntary Petitions to be <u>nunc pro tunc</u> to the dates of filing and an order barring the Petitioning Creditors from participating in the filing of any involuntary bankruptcy petition in this district against Brunner, or any entity in which Brunner has an interest, without first obtaining leave of the court.

2.  <u>Petitioning Creditors' Contentions</u>

Petitioning Creditors contend that the Involuntary Petitions were not filed in bad faith because at the time of filing they were unaware of the requirements of § 303.[18]  According to the Petitioning Creditors, because they did not become aware of their ineligibility until after filing, the Involuntary Petitions were not filed in bad faith, as required for an award pursuant to § 303(i)(2).  The Petitioning Creditors fault their counsel, Pick, for allegedly failing to advise them of the requirements and potential consequences associated with an involuntary bankruptcy petition.  The Petitioning Creditors further assert that at the time of filing they genuinely believed their claims were undisputed.  The Petitioning Creditors further contend that because they did not oppose the Alleged Debtors' motions to dismiss, the Alleged Debtors are not entitled to damages pursuant to § 303(i).

---

[18] Unless otherwise specified, all statutory references are to Title 11, U.S.C.

**B.  Legal Standard**

Section 303(i) of the Bankruptcy Code provides:

If the court dismisses a petition under this section ***other than on consent*** of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court ***may*** grant judgment--
>    (1) against the petitioners and in favor of the debtor for—
>       (A) costs; or
>       (B) a reasonable attorney's fee; or
>    (2) against any petitioner that filed the petition in bad faith, for—
>       (A) any damages proximately caused by such filing; or
>       (B) punitive damages.

11 U.S.C. § 303 (i) (emphasis added).

It is settled law that an award under § 303(i) is within the discretion of the Bankruptcy Court.  See Lubow Mach. Co. v. Bayshore Wire Prods. (In re Bayshore Wire Prods.), 209 F.3d 100, 105 (2d Cir. N.Y. 2000) ("Bayshore"); In re Dombroff, No. 08-75318 (DTE), 2009 WL 4505945, at *4 (Bankr. E.D.N.Y. Nov. 24, 2009) ("[I]f Congress wanted fees and sanctions to be awarded in every case where an involuntary petition was dismissed the Code would state '[t]he court *shall* grant costs and reasonable attorney's fees.'" (citations omitted)).

Any award pursuant to subsections (1) or (2) of § 303(i) is contingent on three prerequisites: (1) the court must have dismissed the involuntary petition; (2) the dismissal must be other than on consent of the petitioning creditors and the debtor; and (3) the debtor must not have waived its right to recovery under the statute.  See R. Eric Peterson Constr. Co. v. Quintek, Inc. (In re R. Eric Peterson Constr. Co.), 951 F.2d 1175, 1179 (10th Cir. 1991).

In this case, the first and third prerequisites are not in dispute.  The Petitioning Creditors do, however, contend that their consent to dismissal precludes an award under either subsection § 303(i).

**C.  Dismissal was not on consent so as to preclude a § 303(i) award.**

Section 303(i) requires, as a precondition to relief, that dismissal is not on consent ***and***

the debtor has not waived its right to relief.  11 U.S.C. § 303(i).  Courts differ as to whether a

debtor's express non-waiver of a right to a judgment under § 303(i) necessarily qualifies its

consent to dismissal, so as to preserve a § 303(i) claim.  Put another way, does a reservation of

rights by an alleged debtor suffice to permit relief to be granted under § 303(i)?  Compare In re

Tichy Elec. Co., 332 B.R. 364, 375 (Bankr. N.D. Iowa 2005) (because the debtor reserved its

right to assert a claim under § 303(i), it did not consent to dismissal within the meaning of §

303(i)), with In re Int'l Mobile Advert. Corp., No. 90-11369S, 1991 WL 156588, at *1–2 (E.D.

Pa. Aug. 13, 1991) (holding that despite debtor's express non-waiver of its rights to damages, the

case was dismissed on consent so as to preclude § 303(i) relief).

In support of their argument that the dismissal of the Involuntary Petitions was on

consent, Petitioning Creditors rely on In re Analytica Wire, Inc., 392 B.R. 618 (Bankr. D. Del.

2008) and In re International Mobile Advertising Corp., 117 B.R. 154 (Bankr. E.D. Pa. 1990)

aff'd, No. 90-11369S, 1991 WL 156588, at *1 (E.D. Pa. Aug. 13, 1991), neither of which

addresses a situation, presented here, where dismissal is sought by the alleged debtor, rather than

by the petitioning creditor or by joint motion.  In Analytica Wire, the petitioning creditor had

filed two involuntary petitions, two days apart, against the debtor: one in the District of Delaware

(the "Delaware petition"), and the other in the District of Columbia (the "DC Petition").  392

B.R. at 621.  The petitioning creditor and the debtor each moved to dismiss the Delaware

petition, representing that "the parties had agreed to proceed by litigating the DC Petition and

dismissing the Delaware Petition."  Id. at 619–20.  Faced with dual motions to dismiss and an

agreed upon course of action that the DC petition would be the one to move forward, the court

concluded that dismissal of the Delaware petition was on consent, precluding a § 303(i) award. Id. at 621.  In International Mobile Advertising, through accounting records provided in discovery, the petitioning creditor became aware that the debtor had more than twelve creditors, rendering the petitioning creditor ineligible to commence an involuntary petition without the joinder of at least two other creditors of the debtor.  117 B.R. at 157.  When the petitioning creditor learned this, the parties agreed to file a "Joint Motion for Dismissal."  Id.  Because dismissal was upon the joint motion of the sole petitioning creditor and the alleged debtor, the court found it was on consent and that § 303(i) did not apply.  Id.  In both of these cases, dismissal was pursuant to § 303(j)(2), as the petitioners and the alleged debtors had moved to dismiss to involuntary petitions.

Notably, in cases where dismissal was upon either a petitioning creditor's motion or a joint motion, the availability of § 303(i) relief turns on whether dismissal was granted on the petitioner's motion, pursuant to § 303(j)(1), or on consent, pursuant to § 303(j)(2).  See, e.g., R. Eric Peterson Constr. Co. v. Quintek, Inc. (In re R. Eric Peterson Constr. Co.), 951 F.2d 1175, 1177, n. 3 (10th Cir. 1991) (noting that had the petitioners moved to dismiss under §303(j)(2), and not (j)(1), the court would have been constrained to find consent).  Here, the motion to dismiss was not filed by the Petitioning Creditors under § 303(j)(1), nor was it a joint motion; rather, the Alleged Debtors moved to dismiss and the Petitioning Creditors did not oppose.  As the court noted in In re Jett, 206 B.R. 407, 409 (Bankr. E.D. Va. 1997), "[a] petitioning creditor's nonopposition to dismissal is not consent under the statute where the debtor seeks damages which are opposed by the creditor."  Accord In re Express Car & Truck Rental, Inc., 440 B.R. 422, 431 (Bankr. E.D. Pa. 2010) (finding that where a petitioning creditor "merely acquiesces" to a debtor's motion to dismiss, the debtor's § 303(i) claim is not defeated); see also In re Olympic

Prop. Partners, No. 15-23658-rdd (Bankr. S.D.N.Y. Jan. 25, 2016), ECF No. 33 (Hearing Tr. at 31:9−12) ("it doesn't really sound like this is consent by the debtor since the debtor had to move to dismiss before [the petitioning creditor] was persuaded to agree with that").

In this case, the Alleged Debtors were forced to make a motion to dismiss. Following the filing of the Involuntary Petitions, Alleged Debtors' counsel sent the June 4 Letter to the Petitioning Creditors and their attorneys, advising that the Involuntary Petitions were frivolous and that they intended to oppose the Involuntary Petitions to the full extent permitted by law. (Ex. 1(i).) The Petitioning Creditors did not respond to this letter and certainly did not agree to dismiss the Involuntary Petitions. (See 10/30 Tr. (Sprei) 104:6−8.) Indeed, after the motions to dismiss the Involuntary Petitions were filed, petitioning creditor Sprei, on July 1, threatened to file an involuntary petition against Brunner. (Ex. 3(l).) The dismissal of the Involuntary Petitions was not "on consent," but rather, the Petitioning Creditors did not, because they could not, oppose dismissal. Consent under § 303(i) is not found where a petitioning creditor merely capitulates to a debtor's request for dismissal.

The Alleged Debtors sought dismissal and § 303(i) damages by the same motion. At every stage of this case, the Alleged Debtors have expressly reserved their rights to pursue § 303(i) damages. The egregious acts of the Petitioning Creditors, which persisted post-filing, coupled with their failure to offer consent until the Alleged Debtors filed a motion to dismiss, render the argument that their "consent" to dismissal precludes a § 303(i) award wholly without merit. Because the Involuntary Petitions have been dismissed, dismissal was not on consent, and the Alleged Debtors have not waived their right to pursue damages, all preconditions to an award to the Alleged Debtors under § 303(i) have been met.

**D.  Attorneys' Fees and Costs Pursuant to § 303(i)**

In the Second Circuit, "[w]hen an involuntary petition is dismissed, 'there is a presumption that costs and attorney's fees will be awarded to the alleged debtor.'"  Crest One Spa v. TPG Troy, LLC (In re TPG Troy, LLC), 793 F.3d 228 (2d Cir. 2015) ("TPG Troy") (citation omitted).  "[T]he burden of proof is on the petitioner to justify a denial of costs and fees."  In re Mountain Dairies, 372 B.R. 623, 637 (Bankr. S.D.N.Y. 2007).  Unlike an award under § 303(i)(2), "bad faith is not a prerequisite to an award of costs and attorney's fees under § 303(i)(1)."  Bayshore, 209 F.3d 100, 105 (2d Cir. N.Y. 2000).

1.  Section 303(i) permits an award of fees incurred pursuing attorneys' fees and damages.

At trial, Petitioning Creditor Sprei testified that he is "willing to pay whatever the legal fees were."  (10/31 Tr. (Sprei) 38:10–12.)  However, the Petitioning Creditors argue that any fee award should be limited to those fees incurred in prosecuting the dismissal motion, and that the Alleged Debtors' request for attorneys' fees incurred in connection with the Sanctions Motion should be denied.

It is well settled that fees associated incurred in litigating an entitlement to fees under § 303(i)(1) are "plainly recoverable."  Orange Blossom Ltd. P'ship v. S. Cal. Sunbelt Developers, Inc. (In re S. Cal. Sunbelt Developers, Inc.), 608 F.3d 456, 463 (9th Cir. 2010) ("This is so because it would be inconsistent to dilute a fees award by refusing to compensate attorneys for

the time they reasonably spent in establishing their rightful claim to the fee." (citations

omitted)).[19]

The Petitioning Creditors contend that attorneys' fees incurred in prosecuting claims for

compensatory or punitive damages under § 303(i)(2) claims are not recoverable. This position

has been rejected by the Second Circuit, as well as by the overwhelming majority of courts that

have addressed this issue. In TPG Troy, although the bankruptcy court denied punitive damages

under § 303(i)(2), the court granted all attorney's fees and costs requested by the alleged debtor,

including the fees incurred in seeking the § 303(i)(2) damages that were denied. See In re TPG

Troy, LLC, No. 12-14965-mg (Bankr. S.D.N.Y. July 18, 2013), ECF Nos. 47, 75, 79. In

affirming, the Second Circuit held that "an award of attorneys' fees and costs serves to

discourage the filing of involuntary petitions to force debtors to pay on a disputed debt. At

bottom, Section 303(i)(1) is a fee-shifting provision that requires no showing of bad faith, and

aims to keep the putative estate whole." TPG Troy, 793 F.3d at 235 (citing In re Kidwell, 158

B.R. 203, 213 (Bankr. E.D. Cal. 1993) ("[T]he operative principle [behind Section 303(i) is] that

one who swats at the hornet had best kill it.")); accord, e.g., DVI Receivables XIV, LLC v.

---

[19] Because § 303(i) is a fee-shifting provision, the Supreme Court's decision in Baker Botts LLP v. ASARCO LLC, 135 S. Ct. 2158 (2015), does not require a different result. In Baker Botts, the Supreme Court held that fees associated with defending an objection to an application for compensation under § 330(a) were not compensable. The Court reasoned that § 330(a) "permits courts to award fees to attorneys for work done to assist the administrator of the estate," and it neither "specifically nor explicitly authorizes courts to shift the costs of adversarial litigation from one side to the other." Baker Botts, 135 S. Ct. at 2164–65 (emphasis added). The Court distinguished § 330(a) from fee-shifting statutes that permit an award of fees on fees. See id. at 2158 (distinguishing the Equal Access to Justice Act (28 U.S.C. § 2412(d)(1)(A)) from § 330(a), as the former expressly authorizes shifting attorneys' fees to a prevailing party, and had previously been recognized as a fee-shifting statute).

Unlike § 330(a), § 303(i) expressly authorizes that "the court may grant judgment— (1) against the petitioners and in favor of the debtor for–(a) costs; or (B) a reasonable attorney's fee," 11 U.S.C. § 303(i)(1), and is "[a]t bottom…a fee-shifting provision that requires no showing of bad faith, and aims to keep the putative estate whole." TPG Troy, 793 F.3d at 235 (emphasis added) (citations omitted); accord In re Forever Green Athletic Fields, Inc., No. BR 12-13888-MDC, 2017 WL 1753104, at *11 (Bankr. E.D. Pa. May 3, 2017) (finding that because § 303(i) is a fee-shifting statute, fees and costs of appellate proceedings relating to a § 303(i) award may serve as the basis of an additional § 303(i) award); In re Rosenberg, No. 09-13196-BKC-AJC, 2017 WL 1102864, at *5 (Bankr. S.D. Fla. Mar. 16, 2017) (distinguishing Baker Botts and holding that "§303(i) is a fee-shifting statute that permits an award of fees on fees").

Rosenberg (In re Rosenberg), 779 F.3d 1254, 1267 (11th Cir. 2015) ("[T]he § 303(i)(1) award of attorney's fees applies to all phases of the § 303 action. … Courts addressing this issue have concluded that a bankruptcy court may award attorney's fees under § 303(i)(1) incurred to prosecute bad-faith claims for damages under § 303(i)(2)."); S. Cal. Sunbelt Dev., 608 F.3d at 461–62 ("[A] bankruptcy court should make a single determination of fee eligibility under §303(i)(1)(B).  If the court finds the debtor is eligible for an award of fees, then…the fee award presumptively encompasses all aspects of the § 303 action, including proceedings on claims under § 303(i)(2)."); In re Forever Green Athletic Fields, Inc., No. BR 12-13888-MDC, 2017 WL 1753104, at *11 (Bankr. E.D. Pa. May 3, 2017) ("It is well established that a former debtor is entitled to reimbursement of its fees incurred in connection with the litigation of a § 303(i) motion."); In re Express Car & Truck Rental, Inc., 440 B.R. 422, 436 (Bankr. E.D. Pa. 2010) ("The Former Debtors' entitlement to 'fees on fees' is well established."); In re Landmark Distribs., Inc., 195 B.R. 837, 845 (Bankr. D.N.J. 1996) (The court may grant § 303(i) fees "*whether related to the alleged debtor's efforts to dismiss the petition pursuant to § 303(i)(1), or to prove bad faith or establish damages pursuant to § 303(i)(2)*."); In re Advance Press & Litho, Inc., 46 B.R. 700, 703 (Bankr. D. Colo. 1984) ("I find nothing in the Code or case authority limiting an award to the date of dismissal.  Preparation for and attendance at the hearing on attorney's fees, costs and damages are also part of the matters which are occasioned as a result of an Involuntary Petition.  As such, they are compensable under § 303(i).").

To limit the recovery of fees in prosecuting a claim under § 303(i), as Petitioning Creditors urge, would undermine the purpose and intent § 303(i)(1).  As noted in Adell v. John Richards Homes Bldg. Co. (In re John Richards Homes Bldg. Co.), 552 F. App'x 401, 408–09 (6th Cir. 2013), "the plain intent of Congress [was] to provide a complete remedy for debtors

who successfully defend against an involuntary petition. … Construing § 303(i) to authorize awards of post-dismissal fees is, therefore, the approach most faithful to legislative intent." Accord Landmark, 195 B.R. at 846 (to deny attorneys' fees incurred prosecuting a § 303(i)(2) claim would "fly in the face of legislative intent and common sense").  Accordingly, the fee award in this case may include fees incurred in all phases of the litigation before this Court.

2.   The totality of the circumstances justifies a § 303(i)(1) award.

In awarding attorneys' fees and costs under § 303(i)(1),

> Most of the courts … have adopted a totality of the circumstances test, in which certain factors are to be considered. These include (1) the merits of the involuntary petition; (2) the role of any improper conduct on the part of the alleged debtor; (3) the reasonableness of the actions taken by the petitioning creditors; and (4) the motivation and objectives behind the filing of the petition.

TPG Troy, 793 F.3d 228, 235 (2d Cir. 2015) (citing In re Taub, 438 B.R. 761, 775 (Bankr. E.D.N.Y. 2010)).

"Involuntary bankruptcy is an extreme remedy with dire consequences upon [an alleged debtor]."  In re Brooklyn Res. Recovery, Inc., 216 B.R. 470, 486 (Bankr. E.D.N.Y. 1997).  As a result, "courts expect petitioning creditors to 'carefully examine the risks undertaken in the filing of an involuntary petition.'"  In re Express Car & Truck Rental, Inc., 440 B.R. 422, 432−33 (Bankr. E.D. Pa. 2010) (citation omitted).  As the Petitioning Creditors have conceded, the Involuntary Petitions lacked any merit.  The Petitioning Creditors have not offered any evidence to rebut the presumption that the Alleged Debtors are entitled to an award of attorneys' fees.

Although they do not dispute that the Alleged Debtors are entitled to attorneys' fees, the Petitioning Creditors object to the amount of legal fees requested, arguing that, "by conducting four (4) depositions and proceeding to trial," the Alleged Debtors "substantially exacerbate[d] the legal fees."  (Pet. Cr. Post-Trial Brief, Anmuth ECF No. 45.)  The Petitioning Creditors are

responsible for these claims being litigated in the bankruptcy court, and by filing the Involuntary

Petitions, they "assume[d] certain risks," including the risk of being required to reimburse legal

fees incurred by the Alleged Debtors in taking part in discovery, trial, and post-trial briefing.  In

re Reveley, 148 B.R. 398, 406 (Bankr. S.D.N.Y. 1992).  The Alleged Debtors' actions in

preparing for the trial on the Sanctions Motions were reasonable.  The four depositions

conducted by the Alleged Debtors appropriately included the three Petitioning Creditors and

counsel who filed the Anmuth petition.  There is no basis to conclude that the Alleged Debtors

failed to act with "appropriate discretion" or unreasonably delayed these proceedings.  In re

Forever Green Athletic Fields, Inc., No. BR 12-13888-MDC, 2017 WL 1753104, at *11 (Bankr.

E.D. Pa. May 3, 2017) ("While case law does observe that a former debtor should act with

appropriate discretion when requesting 'fees on fees'…this Court finds no basis to infer that [the

alleged debtor's] fees and costs incurred in connection with its subsequent § 303(i) requests

somehow represent a failure to abide by a duty to mitigate its damages." (citations omitted));

see also Orange Blossom Ltd. P'ship v. S. Cal. Sunbelt Developers, Inc. (In re S. Cal. Sunbelt

Developers, Inc.), 608 F.3d 456, 463 (9th Cir. 2010) (citing In Commissioner v. Jean, 496 U.S.

154, 161 (1990)) ("Absent unreasonably dilatory conduct by the prevailing party in any portion

of the litigation, which would justify denying fees for that portion, a fee award presumptively

encompasses all aspects of the…action.").

Moreover, the Petitioning Creditors' actions were unreasonable before and after filing the

Involuntary Petitions.  On the night of the filings, the Petitioning Creditors acted with blatant

disregard for the appropriateness of their actions.  Subsequent to the filings, Sprei continued to

threaten and harass Brunner.  When the Alleged Debtors' counsel pointed out that the filings

were frivolous in the June 4 Letter, presenting an opportunity for the Petitioning Creditors to

seek dismissal and potentially avoid or mitigate further liability for attorneys' fees, the Petitioning Creditors elected to ignore the letter.

Based on the totality of the circumstances, the Court grants the Alleged Debtors' requests for their attorneys' fees and costs incurred by Rubin, LLC. The Court has reviewed the firm's fee application and concludes that the amount of fees and costs sought in this case are reasonable under the circumstances. Attorneys' fees and costs in the amount of $114,796.38, and transcription costs in the amount of $6,615.09, will be granted, and further application may be made by the Alleged Debtors for additional fees incurred for services subsequent to October 24, 2018.[20]

### 3. Attorneys' Fees of Tuttle Yick, LLP

The Alleged Debtors request an award of attorneys' fees and costs incurred by Tuttle Yick, LLP ("T.Y."), their state court counsel. Although the burden of proof is on the petitioning creditors to justify the denial of attorneys' fees, "if attorney's fees are allowed, the evidentiary burden to establish the reasonableness of the amount awarded rests upon the putative debtor." In re Diloreto, 388 B.R. 637, 648 (Bankr. E.D. Pa. 2008), aff'd, 442 B.R. 373 (E.D. Pa. 2010) (citing Hensley v. Eckerhart, 461 U.S. 424, 433–34, 438 (1983)). Notwithstanding the Petitioning Creditors' failure to specifically challenge the Alleged Debtors' request for

---

[20] $121,411.47 represents the sum of the Rubin, LLC billing statements submitted by the Alleged Debtors from June 1, 2018 to October 24, 2018. (See Ex. 5 (Rubin, LLC billing statements); Ex. 7 (transcription statements).)

reimbursement of fees incurred to state court counsel, the request must be reviewed for reasonableness pursuant to § 303(i)(1).[21]

"In this Circuit, attorney's fee awards are determined by calculating the 'lodestar' figure, which is based on the number of reasonable hours expended, multiplied by a reasonable hourly rate." Tokyo Electron Arizona, Inc. v. Discreet Indus. Corp., 215 F.R.D. 60, 62 (E.D.N.Y. 2003). The reasonableness of the hourly rate is determined by considering fees that are "customarily charged in the local community by someone who possesses similar skill, experience, expertise, stature and reputation who is faced with similarly novel and complex issues and who procures comparable results." In re Korea Chosun Daily Times, Inc., 337 B.R. 758, 767 (Bankr. E.D.N.Y. 2005) (citations omitted).

The T.Y. fee application lacks sufficient detail to permit an evaluation on the reasonableness of the request. The record is devoid of any information with regard to the "skill, experience, [and] expertise" of T.Y. to enable a comparison to attorney's fees "customarily charged in the local community" by similar counsel. Korea Chosun Daily Times, 337 B.R. at 766; see also In re Hoti Enterprises, 605 F. App'x 67, 68 (2d Cir. 2015) (noting that the bankruptcy court must "carefully and independently review[ ] the attorney time and expense reports to ensure that they were reasonable and commensurate with the tasks undertaken and the hourly rates of competitors in the marketplace"). In addition, the T.Y. time records are not

---

[21] In addition to awarding attorneys' fees under § 303(i)(1), courts have found that actual damages contemplated by § 303(i)(2)(A) encompasses reasonable attorneys' fees and costs. See, e.g., In re Landmark Distribs., Inc., 195 B.R. 837, 847 (Bankr. D.N.J. 1996) (finding attorneys' fees may be awarded under both §§ 303(i)(1) and (i)(2)); In re Ramsden, 17 B.R. 59, 61 (Bankr. N.D. Ga. 1981) ("Costs and reasonable attorney's fees listed in s 303(i)(1) are clearly included within the (i)(2)(A) damages proximately caused by the filing ..."). An award of attorney's fees, pursuant to either § 303(i)(1) or § 303(i)(2)(A), requires a determination of reasonableness via the lodestar approach. See Landmark, 195 B.R. at 848 (employing the lodestar approach in awarding fees under § 303(i)(2)(A)); cf. Nicholas v. Oren (In re Nicholas), 496 B.R. 69, 73–74 ("A court's principal concern when awarding attorney's fees is to insure that the fees awarded are reasonable.").

"sufficiently detailed time records such that the court can determine whether all the fees are reasonable." In re 29 Brooklyn Ave., LLC, 548 B.R. 642, 652 (Bankr. E.D.N.Y. 2016) (finding an attorney's time record entries to be "too vague for the Court to properly ascertain what services were performed"). Furthermore, no testimony was offered at trial regarding the necessity of T.Y.'s services. Rubin, LLC represented the Alleged Debtors in the bankruptcy court, and nothing in the T.Y. fee request or the record of this case indicates why T.Y.'s participation, including attendance at bankruptcy court hearings (see Ex. 6 (July 24, 2018 entry)), was necessary. See 29 Brooklyn Ave., 548 B.R. at 653 (awarding fees only with respect to one attorney where the fee application failed to address why it was necessary for three attorneys to appear at a hearing); In re Forever Green Athletic Fields, Inc., No. BR 12-13888-MDC, 2017 WL 1753104, at *11 (Bankr. E.D. Pa. May 3, 2017) ("Generally, courts do not permit the recovery from an adversary fees incurred by multiple attorneys attending the same proceeding.").

Moreover, the billing statements of T.Y. are not addressed to either of the Alleged Debtors. (See Ex. 6 (statement in the name of "Bruman Realty.") Fees incurred by a "non-debtor … should not be borne by [the] Petitioning Creditors." In re Landmark Distribs., Inc., 195 B.R. 837, 852 (Bankr. D.N.J. 1996); see also Rosenberg v. DVI Receivables XVII, LLC, 835 F.3d 414, 418 (3d Cir. 2016) ("As they were not debtors, the[y] … cannot recover damages from the Defendants under § 303(i).)

For all of the foregoing reasons, the request for the attorneys' fees and costs submitted with respect to T.Y. will be denied.

**E.  Damages Pursuant to § 303(i)(2)**

"[A]n award [under § 303(i)(2)] requires a finding of bad faith … [and] 'there is a

presumption of good faith in favor of the petitioning creditor, and thus the alleged debtor has the

burden of proving bad faith.'"  Bayshore, 209 F.3d 100, 105 (2d Cir. N.Y. 2000) (citations

omitted).

1.  Bad Faith

Under § 303(i)(2), a debtor may only recover actual and punitive damages upon a finding

of bad faith.  11 U.S.C. § 303(i)(2).  As with § 303(i)(1), most courts "determining whether to

award damages under § 303(i)(2) … have adopted a 'totality of the circumstances test.'"  In re

Taub, 438 B.R. 761, 775 (Bankr. E.D.N.Y. 2010) (quoting 2 Collier on Bankruptcy ¶ 303.11

(16th ed. 2013)).  In Bayshore, the Second Circuit delineated various tests applied in making a

bad faith determination:

> Some courts have used an "improper use" test, which "finds bad faith when a
> petitioning creditor uses involuntary bankruptcy procedures in an attempt to
> obtain a 'disproportionate advantage' for itself, rather than to protect against other
> creditors obtaining disproportionate advantages, particularly when the petitioner
> could have advanced its own interests in a different forum." … Other courts have
> applied an "improper purpose" test, where bad faith exists if the filing of the
> petition was motivated by ill will, malice, or a desire to embarrass or harass the
> alleged debtor…. A third line of cases employs an objective test for bad faith
> based on "what a reasonable person would have believed." … Finally … a
> number of courts have sought to model the bad faith inquiry on the standards set
> forth in Bankruptcy Rule 9011.

Bayshore, 209 F.3d 100, 105–06 (2d Cir. N.Y. 2000) (citations omitted) ("[C]ourts have used

different approaches … [b]ecause bad faith is not defined in the bankruptcy code, and because

there is no legislative history addressing the intended meaning of this language.").  After noting

that "courts have applied a dizzying array of standards [for evaluating bad faith] … with regard

to post-dismissal motions for damages under § 303(i)(2)," the Third Circuit adopted a "totality of

the circumstances" standard.  In re Forever Green Athletic Fields, Inc., 804 F.3d 328, 335–36 (3d Cir. 2015) (The totality of the circumstances standard "is most suitable for evaluating the myriad ways in which creditors filing an involuntary petition could act in bad faith.")  The "totality of the circumstances" standard has been described as "an amalgam of [the] tests" set forth in Bayshore.  See, e.g., In re Diamondhead Casino Corp., No. 15-11647(LSS), 2016 WL 3284674, at *16–17 (Bankr. D. Del. June 7, 2016); In re Skyworks, 431 B.R. 573, 577 (Bankr. D.N.J. 2010) ("The totality of circumstances should be considered in determining whether the petitioner acted in bad faith including whether the petition was filed for an improper use or purpose and the subjective and objective motives.").  Under any analysis, "[t]he determination of bad faith is 'a fact intensive determination … left to the discretion of the bankruptcy court." Forever Green, 804 F.3d at 335; see also Adell v. John Richards Homes Bldg. Co. (In re John Richards Homes Bldg. Co.), 439 F.3d 248, 254 (6th Cir. 2006).

Here, based on the totality of the circumstances, and under any of the tests delineated in Bayshore, the Petitioning Creditors' bad faith is readily apparent.

(i)  <u>Filing an involuntary petition in response to an adverse state court ruling constitutes bad faith.</u>

On May 31, 2018, hours after the Appellate Court refused to enjoin the drawdown of the SLOCs, or the transfer of the Cash Collateral, the Petitioning Creditors filed the Involuntary Petitions.  Petitioning Creditor Sprei testified,

> Q.  So had Justice Ash issued the stay, or had the appellate division issued a stay of the transfer of the case collateral, would the involuntary petitions have been filed against Anmuth or DuPont or Quest?
>
> A.  No.

(10/30 Tr. (Sprei) 99:18–22.)

An involuntary petition that is filed "to gain an advantage in pending litigation" is filed in bad faith.  Forever Green, 804 F.3d at 332; see also In re Dami, 172 B.R. 6, 10 (Bankr. E.D. Pa. 1994) (where "the purpose of the bankruptcy filing is to defeat state court litigation…bad faith exists."); In re St. Marie Dev. Corp. of Montana, Inc., 334 B.R. 663, 671 (Bankr. D. Mont. 2005) (finding bad faith where there was pending state court litigation between the parties); In re WLB-RSK Venture, 296 B.R. 509, 515 (Bankr. C.D. Cal. 2003) ("[T]his involuntary petition against the alleged debtor [was filed] as a litigation tactic, after his litigation in other courts was unavailing, and in a forum shopping effort to avoid the latest, still pending litigation in the state court."), aff'd, 320 B.R. 221 (B.A.P. 9th Cir. 2004), aff'd, 223 F. App'x 555 (9th Cir. 2007).

The filing of an involuntary petition to circumvent an adverse decision in the state court, or to preempt an impending state court decision, or to stay a decision in the state court from taking effect, constitutes evidence of bad faith.  See, e.g., Forever Green, 804 F.3d at 337 (bad faith found where the involuntary petition was filed days before the petitioner creditor's brief was due in state court); In re Law Ctr., 261 B.R. 607, 613 (Bankr. M.D. Pa. 2001) ("Considering foremost the historical sequence of events that led to the Involuntary filing, I would be hard pressed to conclude other than the Involuntary was filed solely to circumvent the state court determinations…."), subsequently aff'd sub nom. Shinko v. Miele, 29 F. App'x 890 (3d Cir. 2002); In re Cadillac by DeLorean & DeLorean Cadillac, Inc., 265 B.R. 574, 581–82 (Bankr. N.D. Ohio 2001) (finding timing to be "significant" on the issue of bad faith where the "quick sequence of events indicates that Petitioners' motive in filing these involuntary bankruptcies was revenge"); cf. In re HBA East, Inc., 87 B.R. 248, 259–60 (Bankr. E.D.N.Y. 1988) (dismissing a voluntary Chapter 11 petition based on bad faith, stating "[a]s a general rule where, as here, the

timing of the filing … is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith").

The parties here have been battling in state court since 2015, where litigation remains pending. Miller, the sole Petitioning Creditor that is a party in the state court litigation, has sought a stay in state court numerous times. Indeed, Miller was granted a stay on May 18, 2018, which was vacated by the 5/29 Decision. Upon his appeal of the 5/29 Decision and request for a stay, the state Appellate Court refused to enjoin the draw upon the SLOCs or the transfer of the Cash Collateral. The Involuntary Petitions were filed *within hours* of receiving that adverse decision in the Appellate Court. At trial, Sprei testified that, "the idea [in order] to get the money frozen from Investors Bank was to file an involuntary bankruptcy to stay the money being transferred from the bank." (10/30 Tr. (Sprei) 83:18–20.)

Where, as in this case, a petition is filed as a litigation tactic, solely to avoid the consequences of an adverse state court decision, bad faith is manifest. Here, the timing of the filing of the Involuntary Petitions demonstrates "egregious bad faith and an improper use of the bankruptcy system." In re Silverman, 230 B.R. 46, 52 (Bankr. D.N.J. 1998) (finding that the filing of an involuntary petition after an adverse state court ruling is "per sufficient to prove that creditor acted in bad faith," and an involuntary petition filed "*within weeks* of the state court ruling" constitutes "egregious bad faith") (emphasis added).

(ii) Filing an involuntary petition to coerce a settlement constitutes bad faith.

The Petitioning Creditors' testimony at trial confirms their improper use of the Bankruptcy Code. In addition to admitting that the Involuntary Petitions would not have been filed had they been successful in state court, Sprei testified,

> Q. Okay. On May 31 were you hoping that the filing of the involuntary petitions would force a quick settlement?

> A. I was hoping that it would freeze that money that belongs to Mr. Leser and Mr. Miller, and I was hoping that it'll bring a settlement, correct.

(10/30 Tr. (Sprei) 93:17–21.) Consistent with Sprei's testimony, Pick testified that at their meeting on the evening of May 31, 2018, the date the Involuntary Petitions were filed, Sprei "was more concerned with emphasizing upon us this was an emergency, it will get settled." (10/30 Tr. (Pick) 54:15–17; see also 10/30 Tr. (Pick) 27:9–11 ("Sprei told us the claims were going to be resolved very, very fast following the filing of the involuntary petition."); 10/30 Tr. (Pick) 31: 19–21 ("[Sprei] was absolutely convinced it would settle very, very fast, immediately following the filing of the involuntary petition.").)

   In Forever Green, the court found bad faith upon reviewing the petitioning creditor's actions, finding that the petitioning creditor's conduct "indicates that his litigation strategy was to use any means necessary to force…payment." 804 F.3d at 336. Here, it is not necessary to engage in a searching review of the Petitioning Creditors' conduct, as Sprei testified at trial, "I will do whatever remedies I need to get back that money." (10/31 Tr. 43:13–14.)

   "The bankruptcy court cannot properly be employed as a rented battlefield, to achieve ends for which it never was intended." In re Murray, 543 B.R. 484, 496 (Bankr. S.D.N.Y. 2016), aff'd, 565 B.R. 527 (S.D.N.Y. 2017), aff'd, 900 F.3d 53 (2d Cir. 2018). "The Bankruptcy Code was not intended to permit … put[ting] a debtor into involuntary bankruptcy, negotiate a settlement and walk way." In re Grossinger, 268 B.R. 386, 389 (Bankr. S.D.N.Y. 2001). Whether an involuntary petition filed as part of a litigation strategy to coerce the alleged debtor into settling is relevant to any consideration of a petitioning creditor's bad faith. In re Reveley, 148 B.R. 398, 411 (Bankr. S.D.N.Y. 1992). "To use an involuntary filing as a tactic to 'work it out' with one's alleged obligor is an abuse of the bankruptcy process." Grossinger, 268 B.R. at 388; see also Skyworks, 431 B.R. at 579 (noting that the filing of an involuntary petition to

pressure the alleged debtor into settling is "an improper use of the bankruptcy process for an improper purpose").

The Petitioning Creditors' admitted purpose in filing the petitions to pressure Brunner to settle the parties' disputed claims constitutes manifest bad faith.

   (iii) <u>Filing an involuntary petition with ill will, malice, or a desire to embarrass and harass the debtor constitutes bad faith.</u>

"[B]ad faith exists if the filing of the petition was motivated by ill will, malice, or a desire to embarrass or harass the alleged debtor." <u>Bayshore</u>, 209 F.3d at 105. "[C]ourts should be wary of creditors who may find alluring the 'retributive quality' of thrusting a debtor into bankruptcy." <u>Forever Green</u>, 804 F.3d at 335; <u>see also</u> <u>In re Camelot, Inc.</u>, 25 B.R. 861, 868–69 (Bankr. E.D. Tenn. 1982) ("Dissatisfied with the outcome of the legal proceedings which they had commenced in [state court], [the petitioning creditors] vindictively filed an involuntary petition…."); <u>In re Landmark Distribs., Inc.</u>, 189 B.R. 290, 306 (Bankr. D.N.J. 1995) ("[T]he Bankruptcy Code was created by Congress to act as a shield for debtors, rather than as a sword for creditors.").

Petitioning Creditors argue that a non-debtor cannot recover fees or damages under § 303(i) and therefore any actions taken against Brunner should not be considered. This argument must be rejected. Whether or not a non-debtor may recover under § 303(i), malicious actions undertaken against Brunner are plainly relevant as indicia of bad faith. "Courts have employed a more expansive definition of bad faith to include ill will or malice toward the debtor or its owners." <u>Jaffe v. Wavelength Inc. (In re Wavelength, Inc.)</u>, 61 B.R. 614, 620 (B.A.P. 9th Cir. 1986) (citing <u>In re Advance Press & Litho</u>, 46 B.R. 700, 704 (Bankr. D. Colo. 1984)). Moreover, the continued threats of additional involuntary filings against Brunner are unquestionably relevant to the appropriateness of punitive damages to deter future improper

conduct.  See Silverman, 230 B.R. at 46 ("[A]ll mitigating or aggravating factors are nonetheless relevant in assessing punitive damages [under § 303(i)(2)].");  cf. In re TPG Troy, LLC, Nos. 12-14965, 12-14966, 2013 WL 3789344, at *5 (Bankr. S.D.N.Y. July 18, 2013) (a § 303(i) award should "serve as a deterrent to similar misconduct in the future."), aff'd, 793 F.3d 228 (2d Cir. 2015).  Additionally, as evident in the underlying transaction here, in which Brunner personally guaranteed the SLOCs, harm to Brunner's "track record" and "credit" can directly damage his businesses.  (See 10/30 Tr. (Brunner) 147:11–14 ("When Quest was opened it didn't -- it wasn't able to get any credit from any banks unless I personally guaranteed and personally backstopped it on its own."); 10/30 Tr. (Brunner) 150:15–20 ("[O]n most [loan applications] there's a question as to have you ever filed bankruptcy or have any of your companies been involved in a bankruptcy.  I had an impeccable record for over 20 years.  Unfortunately, since these filings I'm obligated to notify the lenders [of the Involuntary Petitions]."));  see also John Richards Homes, 439 F.3d at 262 (awarding § 303(i) damages where involuntary petition negatively affected reputation of principal, which was "absolutely critical" to the business).

In this case, there is ample evidence to support a finding that the Involuntary Petitions were filed with ill will, malice, and desire to embarrass and harass the Alleged Debtors and Brunner.  At his deposition, Leser testified,

> Q.  Do you believe that you did anything wrong in connection with the filing of the involuntary petitions against Anmuth and Quest?
>
> A.  Not at all.
>
> Q.  Why do you say that?
>
> A.  Because a ganef, you have to go with schtick, and he is a real, real lowlife ganef.
>
> Q.  You said with regard to a ganef, you have to go with schtick?
>
> A.  You have to go with the hard way…

(Leser Dep. Tr. 84:14–25.)[22]  Leser's testimony illustrates the type of "personal antipathy" to be considered when determining whether a filing was motivated by ill will.  In re Better Care, Ltd., 97 B.R. 405, 412 (Bankr. N.D. Ill. 1989).

In deciding whether a petition is motivated by ill will or malice, courts evaluate the actions of the petitioning creditor before and after filing.  See In re Advance Press & Litho, 46 B.R. 700, 704 (Bankr. D. Colo. 1984) (Petitioning creditor's "hostility was also demonstrated not only in her actions against [the alleged debtor] before the Petition was filed but also during the proceedings.").  Sprei's post-filing conduct flagrantly exposes bad faith.  After filing the Involuntary Petitions against three of Brunner's entities, Sprei sent repeated messages threatening to file an involuntary petition against Brunner personally.  (See Exs. 3(j)–3(l).)  At trial, Sprei testified that the threatening messages he sent to Brunner's business partner were intended to "put pressure" on Brunner to participate in arbitration in rabbinical court.  (See 10/30 Tr. (Sprei) 118:11–14; 10/31 Tr. (Sprei) 43:1–5.)   When Sprei was confronted with one of the threatening messages he had sent to Brunner's business partner, Sprei testified,

> Q.  The last line, "I wanted to just let you know Monday I am filing bankruptcy against [Brunner] personally. And that means that he can't do anymore business for a long time, not playing around, not going to waste more time, so it's either happening or not." Do you see that language?
>
> A.  Yes.
>
> …
>
> Q.  … is this another threat from you threatening to throw Mr. Brunner into personal bankruptcy unless he settles with you?
>
> A.  This is not a threat to Mr. Brunner…. I told [Brunner's business partner] that Mr. Brunner is taking the money that he[ ] owe[s] to Mr. Miller, to Mr. Lesser [sic] and to me and he's running off [with] it, I was on the phone with him, he said he cannot do anything, so I told him if he cannot bring the signed arbitration, I have to be able to protect the money that's being stolen.

---

[22] Miller testified that a ganef "[m]eans somebody who steals," a "[t]hief," and that schtick "means probably not everything is done straight."  (10/30 Tr. (Miller) 78:12–22.)

(10/30 Tr. (Sprei) 112:5–113:9.)  Sprei's threatening messages to Brunner reveal his intent to use bankruptcy as a weapon to force Brunner to terminate his § 303(i) claims.  See Forever Green, 804 F.3d at 336–37.

Sprei's text messages not only show that the Involuntary Petitions were filed for an improper purpose, but they additionally demonstrate that Sprei appreciated, yet disregarded, the serious consequences an involuntary petition inflicts on the alleged debtor.  For example, on July 1, 2018, Sprei wrote, "[w]ant to just let you know Monday I am filing in bankruptcy against [Brunner] personal **and that means he can't do any more Bussines [sic] for a long time not playing around not going to waste more time**…." (the "July 1 Message"). (Ex. 3(l) (emphasis added).)  When asked at trial if he was aware "that the filing of an involuntary petition is a serious matter," Sprei testified that he became aware "[a]fter the filing, not before."  (10/30 Tr. (Sprei) 91:24–92:1.)  The Alleged Debtors filed their motions to dismiss and for sanctions on June 28, 2018.  (Anmuth ECF No. 10; Quest ECF No. 9.)  That same day, Pick emailed Sprei pleading with him to "please take this very seriously."  (Ex. 3(c).)  Not only did Sprei reply to Pick that he "was not worried about it," but three days later he sent the July 1 Message, threatening to file another involuntary petition against Brunner personally.  (See id.; Ex. 3(l).)  Undoubtedly, after receiving the motions to dismiss and for sanctions and communicating with Pick, Sprei appreciated the seriousness of filing an involuntary petition.  Nevertheless, he continued to threaten additional involuntary filings, even after the Sanctions Motion was filed, texting, on October 16, 2018, that "it will become very dirty" and "verry [sic] ugly for [Brunner]."  (10/30 Tr. (Sprei) 113:13–114:5; Ex. 3; Ex. 3(m).)  This is precisely the type of malicious conduct that § 303(i) was enacted to police.

Further, Sprei's post-filing actions "reflect a pattern of harassment, overreaching, uncompromising combativeness, intimidation, even deceit and threats." In re Oakley Custom Homes, Inc., 168 B.R. 232, 239 (Bankr. D. Colo. 1994). In an effort to stop Brunner from prosecuting his § 303(i) claim, Sprei obtained a letter from rabbis criticizing Brunner for proceeding in civil court. (10/30 Tr. (Sprei) 118:20−22.) Sprei posted this letter on telephone poles and in synagogues in Brooklyn. (Id. at 119:1−2.) He hired a company to print leaflets denouncing Brunner, which were disseminated in synagogues in Brooklyn. (Id. at 118:23−119:9; see also Ex. 3(k) ("Pushing in [Brunner] today personal. Bankruptcy. Just letting you know a truck will be going around today.").)

In John Richards Homes Building, the court found that $2 million in punitive damages was "an appropriate award given [the petitioning creditor's] unprecedented use of the involuntary bankruptcy process to intentionally inflict injury as well as his actions to exacerbate the impact of this injury (e.g., hiring the public relations firm to publicize the involuntary petition)." 312 B.R. 849 (E.D. Mich. 2004), aff'd, 439 F.3d 248 (6th Cir. 2006). The filing of the Involuntary Petitions, and Sprei's post-filing actions to embarrass and harass Brunner, were part of the Petitioning Creditors' general litigation strategy to pressure Brunner to coerce a settlement. The conclusion that the Involuntary Petitions were filed in bad faith is "almost inescapable." Oakley Custom Homes, 168 B.R. at 239 (finding petition was filed in bad faith as it was "the product of a business war and personal vendetta … against th[e] Alleged Debtor and its principal"). For all of the foregoing reasons, the Involuntary Petitions were filed for an improper purpose in bad faith.

(iv) <u>Failure to conduct a reasonable inquiry before filing an involuntary petition that has no basis in law or fact constitutes bad faith.</u>

In determining bad faith under the totality of circumstances, courts consider whether the involuntary petition was meritorious and whether the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing. See <u>Forever Green</u>, 804 F.3d at 336; <u>see also</u> <u>Landmark</u>, 189 B.R. at 306 (noting that it has been generally recognized that "petitioning creditors should carefully examine the risks undertaken in the filing of an involuntary petition."). Where an involuntary petition has no basis in law or fact, the intent of the creditor is malicious. <u>In re Meltzer</u>, 535 B.R. 803, 816 (Bankr. N.D. Ill. 2015) (finding malice where petitioning creditors' claims were subject to a bona fide dispute and petition was filed to stay a state court action). On this score, bad faith is measured by "what the petitioning creditor knew or should have known" with respect to the petition's merit, and whether the petitioning creditor "knowingly alleg[ed] false information" or displayed a "reckless disregard of the truth." <u>In re Dino's, Inc.</u>, 183 B.R. 779, 783 (S.D. Ohio 1995) (citing <u>In re Crown Sportswear, Inc.</u>, 575 F.2d 991 (1st Cir. 1978)). Creditors act in bad faith when they file an involuntary petition knowing their claims are in bona fide dispute. <u>See, e.g.</u>, <u>John Richards Homes</u>, 439 F.3d at 262 (finding bad faith where the petitioning creditors obviously knew the claims were disputed); <u>Grossinger</u>, 268 B.R. at 389 (stating that the petitioning creditor admitted to filing an involuntary petition in hopes of forcing a settlement, and as such "[t]he claim was obviously in dispute, else there would have been nothing to 'work out' and no reason to file the involuntary petition").

It is obvious that the Petitioning Creditors were aware, at all relevant times, that their claims were disputed. The claims had been the subject of over four years of litigation between the parties in state court. In addition to the state court litigation, the parties had participated in arbitration in rabbinical court, and Sprei was desperately attempting to coerce Brunner to return

to arbitration.  (10/31 Tr. (Sprei) 42:11–14.)  The Petitioning Creditors admit that the Involuntary Petitions were filed to force a settlement with Brunner.[23]  Any contention that the Petitioning Creditors were unaware that their purported claims were disputed is simply unbelievable.

In addition, the Involuntary Petitions are devoid of any basis in fact or law.  Miller is the only petitioning creditor that has even a purported claim, albeit both contingent and disputed, against the Alleged Debtors.[24]  Leser and Sprei are not parties to the L/C Agreement, they do not have any interest in the Cash Collateral, and thus have no claim whatever against Anmuth or Quest.  See Meltzer, 535 B.R. at 816 (finding the petition was filed for an improper purpose where, among other things, two of the creditors "had no claim whatever against" the debtor and the third creditor's claim was subject to a bona fide dispute); Camelot, 25 B.R. at 868–69 (finding it "particularly disturbing" that the petitioners "were not even creditors of the debtor when they filed the involuntary petition and…alleged the debtor was not generally paying its debts").  The Petitioning Creditors stated under oath in the Involuntary Petitions that their claims were undisputed and that the Alleged Debtors were not paying their debts, neither of which were true.  The Involuntary Petitions were "utterly baseless."  Grossinger, 268 B.R. at 388.

Moreover, the Petitioning Creditors admit that they made no effort of any kind to investigate whether "[t]he debtor is generally not paying its debts as they come due," an allegation the Petitioning Creditors attested to on the Involuntary Petitions against Anmuth and Quest.  (See Invol. Pet., Anmuth ECF No. 1; Invol. Pet., Quest ECF No. 1.)  Sprei rushed to an

---

[23] At his deposition, Leser testified that Sprei and Miller communicated to him that the Involuntary Petitions are "a piece of paper to try to get him to sit down."  (Leser Dep. Tr. 59; 85:19–24.)  Sprei testified he "was hoping that [the Involuntary Petitions] would freeze th[e] money … and … bring a settlement." (10/30 Tr. (Sprei) 93:17–24.)

[24] See 5/29 Decision, finding that the L/C Agreement "only proves that Miller has a contingent interest to much of the collateral and that entitlement is triggered when the collateral is returned to Anmuth."  (Ex. 1(e) at 6.)

attorney after failing to obtain the stay in the state Appellate Court and advised counsel that it

was an "emergency" and the filings "had to be done before the morning." (10/30 Tr. (Pick)

32:11–16.) Sprei testified,

> Q.  Did you make any effort to find out what an involuntary bankruptcy petition
>     is before those three petitions were filed?
>
> A.  No.

(10/30 Tr. (Sprei) 82:24–83:2.)

> Q.  Did you actually have an understanding at any time whether Anmuth was
>     paying its creditors in the ordinary course of business?
>
> A.  I don't know.
>
> Q.  Did you ever make any effort to find out whether [Anmuth was paying its
>     creditors] –
>
> A.  No.

(10/30 Tr. (Sprei) 84:20–25.)

> Q.  What inquiry, if any, did you perform before filing the involuntary petition
>     against Quest to determine whether Quest was paying its debts as they come
>     due in the ordinary course?
>
> A.  Nothing.

(10/30 Tr. (Sprei) 97:23–98:2.) Miller testified that he made no inquiry at all with respect to the

accuracy of the Involuntary Petitions and relied on Sprei. (10/30 Tr. (Miller) 74:17.) When

asked whether he made any such inquiry, Leser testified, "I did not. I know [Sprei] took a

lawyer." (Leser Dep. Tr. 72:16–17.) Leser further testified that he had never seen a copy of the

Involuntary Petitions prior to his deposition. (See Leser Dep Tr. 40:11–17; 60:24.) The

Petitioning Creditors utterly failed to "engage[ ] in the type of due diligence and sober decision-

making process that should precede any involuntary petition." Forever Green, 804 F.3d at 337.

For all of the above reasons, the Involuntary Petitions were filed in bad faith.

2.  Advice of Counsel Defense

Though at the July 24, 2018 hearing the Petitioning Creditors conceded that their claims were subject to a bona fide dispute, at trial they argued that because they did not become aware that their claims were disputed until they retained new counsel after the filings, the Involuntary Petitions should not be found to have been filed in bad faith.  (10/31 Tr. (Sprei) 38:19–22, 10/31 Tr. (Miller) 72:22–73:2, 85:4–7.)

At the outset, the advice of counsel defense can only to be considered with respect to the Anmuth petition.  Sprei filed the Quest petition himself, (10/30 Tr. (Sprei) 96:6–8,) and although his services were requested, Pick took no part in the preparation or filing of the Quest petition. (10/30 Tr. (Pick) 35:14–21.)

The advice of counsel defense "cannot reduce an award based on improper purpose and blatant disregard for the statutory requirements."  In re Silverman, 230 B.R. 46, 54 (Bankr. D.N.J. 1998); see also In re Reveley, 148 B.R. 398, 408 (Bankr. S.D.N.Y. 1992) ("Where the petition is motivated by ill will or malice, reliance upon counsel's advice will not preclude a finding of bad faith on the part of the petitioner."); In re Advance Press & Litho, Inc., 46 B.R. 700, 705 (Bankr. D. Colo. 1984) (same).

With regard to the reliance on counsel, the Petitioning Creditors' testimony was contradictory and lacked credibility.  Sprei was the sole Petitioning Creditor physically present at the meeting with Pick on May 31 when the petition against Anmuth was filed.  Sprei testified that on May 31, he and Pick never discussed the concept of a bona fide dispute (10/30 Tr. (Sprei) 91:21–23); yet, according to Leser, the issue did in fact arise, and Leser represented to "whoever called" him that the claims were undisputed.  (Leser Dep. Tr. 94:9–95:14.)  At his deposition, Leser testified,

Q. Do you recall ever telling anyone that you hold a valid, undisputed, noncontingent claim against Anmuth or DuPont?

A. Probably.

Q. You probably said that?

A. Probably. I believe so. I still believe.

Q. Can you explain to me what mean by a valid, undisputed, noncontingent claim against Anmuth?

A. How could you explain self-explanatory words?

Q. So you understand wh[at] those words mean, "a valid, undisputed, noncontingent claim against Anmuth," you understand the meaning of those words?

A. Yes.

Q. And you believe that you had said that you held such a claim against Anmuth?

A. I believe I said that. I don't remember.

Q. Well, do you believe that today you said that?

A. Yes.

Q. And you said that to whom?

A. Whoever called me. I don't remember who was on the phone, Mr. Sprei or Mr. Miller or whatever.

(Leser Dep. Tr. 94:9–95:14.)  Consistent with Leser's testimony, Pick testified that, "Sprei was on the phone with Mr. Lesser [sic] and Mr. Miller repeating what I was saying to him."  (10/30 Tr. (Pick) 61:23–24.)[25]

Pick further testified that he explained to Sprei, who relayed the information to Miller and Leser, "in detail" what is meant by an undisputed claim and that Sprei was "adamant that the numbers were undisputed."  (10/30 Tr. (Pick) 17:23–25.)  Pick testified that he warned Sprei that "one of the major issues with respect to contesting an involuntary petition is usually that the claim itself is in dispute," that "there are real issues of sanctions," and "that any dispute as to the claim is going to be troublesome."  (Id. at 20:8–11, 54:3–5.)

---

[25] Miller testified that he never met Pick and does not remember ever speaking to him.  (See 10/30 Tr. (Miller) 1–4.)

Whatever Pick may have advised them, the Petitioning Creditors clearly filed the Involuntary Petitions with knowledge that the claims were subject to a hotly contested dispute, given that, hours earlier, the Appellate Court had ruled against them.  See Silverman, 230 B.R. at 54 ("Even if [petitioning creditor] relied on advice of counsel, he nonetheless filed the petition with knowledge that the superior court had just found that there were genuine issues of material fact as to his claim….The advice of counsel defense… cannot reduce an award based on improper purpose and blatant disregard for the statutory requirements….If [the petitioning creditor] "relied with naïve innocence on his attorney's advice to file an involuntary bankruptcy petition…which this court does not believe, [petitioning creditor] and his attorneys can deal with the consequences between themselves.").

At trial, when questioned about the May 31 meeting at Pick's office, in an apparent attempt to bolster his reliance on counsel defense, Sprei testified,

> Q.  Did [Pick] tell you that he would just only file the petition, but if there was any fighting about the petition that he wouldn't handle that part?
>
> A.  No, he told me that if he filed a petition and he says that -- you know, **he says he knows Mr. Rubin [counsel for the Alleged Debtors] and he says he'll talk to him after the petition is filed to see if we could settle it**, and then we'll take it from there.

(10/31 Tr. (Sprei) 37:2–8 (emphasis added).)  However, Rubin, LLC did not represent the Alleged Debtors prior to the filing of the Involuntary Petitions, and Mr. Sprei could not have known that the firm would later be retained by the Alleged Debtors.  (10/31 Tr. 86:9–87:25.) Sprei's obviously false testimony further undermines the credibility of the Petitioning Creditors' claims that they filed the Involuntary Petitions based upon Pick' advice.

Courts that have found that good faith reliance on counsel's advice can operate either as a mitigating factor or to absolve the petitioner of all liability have done so where the bad faith

finding was exclusively premised on "improper use."  <u>See, e.g.</u>, <u>Advance Press & Litho</u>, 46 B.R.

at 704; <u>In re Better Care, Ltd.</u>, 97 B.R. 405, 412 (Bankr. N.D. Ill. 1989).

> Where the attorney advises the client that this purpose should be effectuated by an
> involuntary bankruptcy, it is the attorney who is responsible for the improper use,
> not the client.  Where, however, the purpose is improper, the client will usually
> come into the attorney's office with that purpose already formed. It is the purpose
> which constitutes bad faith in such a case and it is the client who is responsible for
> the purpose. … They cannot now hide behind that advice when the consequences
> of their decision are visited upon them.

<u>Better Care</u>, 97 B.R. at 412–13.  Sprei's own testimony confirmed that he entered Pick's office

with his improper purpose already formed.  At trial Sprei testified,

> Q.  Okay. For what purpose did you meet with Mr. Pick [on May 31]?
>
> A.  The reason was that Mr. Brunner was trying to run off with the money of the letter
> of credit, that he made in Investors Bank, the appellate division denied the stay, …
> so I had spoken to [another attorney] regarding what we should do and on the idea
> to get the money frozen from Investors Bank was to file an involuntary bankruptcy
> to stay the money being transferred from the bank.
>
> Q.  The first time you spoke with Mr. Pick was May 31st; is that correct?
>
> A.  That is correct.

(10/30 Tr. (Sprei) 83:13–23.)  Moreover, the record, at a minimum, establishes that Pick warned

Sprei that "[t]he threat of sanctions is serious," and to "please take this very seriously," after the

motions to dismiss and for sanctions were filed on June 28, 2018.  (Ex. 3(a), (c).)  Sprei's threats

to Brunner continued after Pick sent the June 28 email advising Sprei of the seriousness of the

matter.  (<u>See, e.g.</u>, Ex. 3(l).)  Evidently, Sprei did not heed counsel's advice.

In short, damages pursuant to § 303(i)(2) are appropriate in light of manifold indicia of

bad faith, in that (1) the Involuntary Petitions were filed without even colorable grounds under

the governing statute, 11 U.S.C. § 303, and within hours after the adverse decision rendered by

the Appellate Court for the sole purpose of avoiding the consequences of that decision; (2)

Petitioning Creditors failed to engage in any investigation into the merits of the Involuntary

Petitions; (3) the Involuntary Petitions were filed to coerce a settlement; (4) Petitioning Creditors demonstrated ill will, malice, and intent to embarrass and harass the Alleged Debtors and their principal; and (5) Petitioning Creditors threatened further involuntary filings.

### 3.   Compensatory Damages

Upon a finding of bad faith, an award under § 303(i)(2) is not automatic.  In re Tichy Elec. Co., 332 B.R. 364 (Bankr. N.D. Iowa 2005).  A bankruptcy court has the discretion to award compensatory damages for the injuries proximately caused by the bad faith filing of an involuntary bankruptcy petition pursuant to § 303(i)(2).  See Adell v. John Richards Homes Bldg. Co. (In re John Richards Homes Bldg. Co.), 439 F.3d 248, 260 (6th Cir. 2006).  The award "should be fashioned to compensate [the debtor] for its damages, calculable with a reasonable degree of certainty, proximately caused by the improper filing."  In re John Richards Homes Bldg. Co., 291 B.R. 727, 735 (Bankr. E.D. Mich. 2003), aff'd, 312 B.R. 849 (E.D. Mich. 2004), aff'd, 439 F.3d 248 (6th Cir. 2006).  The burden is on the alleged debtor to establish the nature and the extent of its damages.  In re Mundo Custom Homes, Inc., 179 B.R. 566, 569 (Bankr. N.D. Ill. 1995).  An award of compensatory damages can include remuneration for present and future lost sales, loss of goodwill, and increased credit and bank costs, and litigation costs.  See Tichy Elec. Co., 332 B.R. at 374.

The Alleged Debtors seek compensatory damages suffered by Quest, which has operated as a private lending company for the last ten years.  At the time of filing, Quest had over $4 million in its bank accounts.  (See Ex. 8.)  Brunner testified that at the time of filing, "Quest was a fully operational company and by throwing it into bankruptcy it would have to cease … borrowing and it would have to cease lending immediately. … [I]t threw the company into a full disarray."  (10/30 Tr. (Brunner) 134:11–17.)  The evidence of actual damages offered at trial

consists of Brunner's testimony, Quest's May 2018 bank statements, and a one-page profit-and-loss statement showing a 2017 net income of approximately $2.1 million.  (See Ex. 9.)  Prior to June 4, 2018, the date the Quest petition was filed, Quest's most recent transaction occurred the "[e]nd of March, beginning of April."  (10/30 Tr. (Brunner) 134:18−20.)

The evidence offered with respect to Quest's damages was conclusory and lacked specificity.  See In re Skyworks, 431 B.R. 573, 579 (Bankr. D.N.J. 2010); In re Atlas Mach. & Iron Works, Inc., 190 B.R. 796, 804 (Bankr. E.D. Va. 1995).  Notably absent from the offered evidence was any link between the filings and any loss of business or revenue.  For example, there is no evidence of lost profits, see, e.g., In re Oakley Custom Homes, Inc., 168 B.R. 232, 242 (Bankr. D. Colo. 1994), or that Quest lost any contracts, that Quest failed to obtain a loan, or that customers refused to transact with Quest.  See John Richards Homes, 439 F.3d at 262 (two pending "high-end" sales contracts were lost as a result of the filing).  While expert testimony was not necessary to satisfy Quest's burden that the involuntary filing was the proximate cause of injury, to be awarded compensatory damages, Quest was required to present sufficient evidence that would support a conclusion that injury resulted from the involuntary filings.

Brunner testified that Quest's most recent transaction was a $4.5 million loan "lent at a 14 percent" interest rate at the "[e]nd of March, beginning of April."  (10/30 Tr. (Brunner) 134:18−24.)  No other evidence was submitted regarding Quest's business activity for the first five months of 2018.  Quest seeks compensatory damages of over $2 million, yet the record is devoid of any evidence that would enable a comparison of Quest's 2018 performance to prior years' earnings, or to determine with a "reasonable degree of certainty" that actual damages flowed from the filing of the Involuntary Petition.  See BMW of North America, Inc. v. Gore, 517 U.S. 559, 582 (1996) (stating economic awards may be small where the injury is hard to

quantify or detect); Jaffe v. Wavelength Inc. (In re Wavelength, Inc.), 61 B.R. 614, 620 (B.A.P. 9th Cir. 1986) ("I'm not really that sure of what [the actual damages] are, and, for that reason, I'm not awarding any actual amount. But it is clear to me, from reading the papers, what happened, that there was some substantial damage. The problem is, I can't tell how much. So, in part, that's one reason I'm awarding the punitive damages. But mainly because [the involuntary petition] was outrageous from the very beginning.").

It is apparent that actual harm was likely suffered by the Alleged Debtors as a consequence of the Involuntary Petitions, and that the Petitioning Creditors' bad faith entitles Quest to damages. However, the record is insufficient to determine the amount of any compensatory damages.

4.  Punitive Damages

Section 303(i)(2) of the Bankruptcy Code gives the Court discretion to award punitive damages upon a finding that the involuntary petition was filed in bad faith. TPG Troy, 793 F.3d 228, 235 (2d Cir. 2015). The purpose of punitive damages under § 303(i)(2) is to punish a wrongdoer and deter similar conduct in the future. See In re Grecian Heights Owners' Ass'n, 27 B.R. 172, 174 (Bankr. D. Or. 1982). "Unlike compensatory damages, punitive damages are neither measured by actual loss nor are they measured strictly in light of the impact of the creditor's bad faith on the alleged debtor." In re Silverman, 230 B.R. 46, 52 (Bankr. D.N.J. 1998). Punitive damages under § 303(i)(2) may be awarded whether or not there is proof of actual damages. See In re Advance Press & Litho, Inc., 46 B.R. 700, 706 (Bankr. D. Colo. 1984); Orange Blossom Ltd. P'ship v. S. Cal. Sunbelt Developers, Inc. (In re S. Cal. Sunbelt Developers, Inc.), 608 F.3d 456, 465 (9th Cir. 2010) ("Section 303(i)(2) expressly authorizes a standalone award of punitive damages."); Jaffe v. Wavelength Inc. (In re Wavelength, Inc.), 61

B.R. 614, 619 (B.A.P. 9th Cir. 1986) ("The legislative history of Section 303(i) indicates the use of the term "or" is not exclusive, and therefore punitive damages, if appropriate, may be added to an award of costs and reasonable attorneys' fees.").

In determining the amount sufficient to serve the dual purposes of punitive damages, courts generally consider the degree and nature of the wrong to the debtor, the intent of the creditors, and any surrounding aggravating or mitigating circumstances.  See In re Meltzer, 535 B.R. 803, 815 (Bankr. N.D. Ill. 2015) (citations omitted).  The totality of the circumstances approach considers factors such as the petitioning creditors' net worth and the gravity of the consequences caused by the involuntary filing.  See Silverman, 230 B.R. at 54 (awarding $50,000 in punitive damages in light of petitioner's egregious behavior and net worth).

A punitive damages award must also be considered in light of the Due Process Clause of the Fourteenth Amendment.  U.S. Const. amend. XIV, § 1.  Punitive damages offend due process if an award is grossly excessive in relation to the legitimate interests of punishment and deterrence. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 409 (2003).  In determining whether a punitive damages award is grossly excessive, the court considers the degree of reprehensibility of the defendant's conduct; considers the ratio between the punitive damages award and the amount of actual damages; and compares "the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct."  In re John Richards Homes Bldg. Co., 291 B.R. 727, 738 (Bankr. E.D. Mich. 2003) (citing BMW of North America, Inc. v. Gore, 517 U.S. 559, 575), aff'd, 312 B.R. 849 (E.D. Mich. 2004), aff'd, 439 F.3d 248 (6th Cir. 2006).  Although the Supreme Court has declined to adopt a "bright-line ratio which a punitive damages award cannot exceed," it has noted that, "in practice, few awards

exceeding a single-digit ratio between punitive and compensatory damages, to a significant

degree, will satisfy due process." State Farm, 538 U.S. at 425.

With respect to the first factor, the Petitioning Creditors' actions reveal that they were

motivated by malice and ill will.  See Sjostedt v. Salmon (In re Salmon), 128 B.R. 313, 318–19

(Bankr. M.D. Fla. 1991) (awarding $250,000 in punitive damages where petitioners acted

willfully and maliciously).  The Petitioning Creditors acted vindictively, In re Camelot, Inc., 25

B.R. 861, 869 (Bankr. E.D. Tenn. 1982) (awarding punitive damages where petitioners

vindictively filed their petition), in a blatant attempt to circumvent the pending state court

litigation between the parties and the decision of the Appellate Court, and without regard to the

requirements of the Bankruptcy Code.  The degree of reprehensibility of the Petitioning

Creditors' conduct is heightened in light of the post-filing conduct of Sprei and the continued

threats of further involuntary filings.  Adell v. John Richards Homes Bldg. Co. (In re John

Richards Homes Bldg. Co.), 312 B.R. 849, 866 (E.D. Mich. 2004) (awarding $ 2 million in

punitive damages because of the petitioning creditor's "use of the involuntary bankruptcy

process to intentionally inflict injury as well as his actions to exacerbate the impact of this injury

(e.g., hiring the public relations firm to publicize the involuntary petition)"), aff'd, 439 F.3d 248

(6th Cir. 2006).

With respect to the second factor, the ratio between actual damages and punitive

damages, the quantifiable actual damages which are being awarded to the Alleged Debtors herein

consist of attorneys' fees and costs.  See In re Landmark Distribs., Inc., 195 B.R. 837, 847

(Bankr. D.N.J. 1996) (finding attorneys' fees may be awarded under both §§ 303(i)(1) and

(i)(2)); In re Ramsden, 17 B.R. 59, 61 (Bankr. N.D. Ga. 1981) ("Costs and reasonable attorney's

fees listed in § 303(i)(1) are clearly included within the (i)(2)(A) damages proximately caused by the filing….").

Not included in the billing statements of Rubin, LLC, totaling $121,411.47, for the period June 1, 2018 to October 24, 2018, are charges for (i) drafting the Alleged Debtors' reply brief filed on October 28, 2018 (Anmuth ECF No. 35); (ii) drafting and filing of JPTO (Anmuth ECF No. 36); (iii) preparing for trial; (iv) attending trial on October 30, 2018 and October 31, 2018; and (v) preparing and drafting the Alleged Debtors' post-trial brief.  Counsel for the Alleged Debtors' have a blended billing rate of $461.50 per hour.  (Pet. Cr. Post-Trial Brief, Anmuth ECF No. 45.)  After adding legal fees incurred after October 24, 2018, which the Alleged Debtors may obtain on further application, it appears that the attorneys' fees incurred by the Alleged Debtors will substantially exceed $150,000.

Here, a punitive damages award of $600,000 is well within the ratio that the Supreme Court has found permissible.  See In Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23 (1991) (noting the constitutionality of a 4–to–1 ratio); BMW of North America, Inc. v. Gore, 517 U.S. 559, 581 (1996) (same).  The punitive damage award is especially appropriate in light of the Petitioning Creditors' egregious bad faith conduct.  See State Farm, 538 U.S. at 425 (noting that "because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'" (quoting Gore, 517 U.S. at 582)).  The Petitioning Creditors' lack of remorse and threats of future involuntary petitions are significant aggravating factors in assessing punitive damages.  See Meltzer, 535 B.R. at 817 ("Recidivism is an aggravating factor in awarding punitive damages.")

With respect to the third factor, a comparison to the civil and criminal penalties that could be imposed for similar conduct, the warning notice contained in "Official Form 205, Involuntary Petition Against a Non-Individual" serves as a guidepost. The notice reads,

> **WARNING** – Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.

(See, e.g., Invol. Pet., Anmuth ECF No. 1.) The above warning is contained in "Part 4: Request for Relief" on the Anmuth and Quest petitions. (Id.) In assessing punitive damages, consideration of the criminal and civil penalties that could be imposed allows courts to show "'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue." Gore, 517 U.S. at 583 (citations omitted). The Petitioning Creditors' false statements made on the Involuntary Petitions carry the potential of $3 million in collective fines (for each of the Petitioning Creditors, $500,000 for the Anmuth petition, and $500,000 for the Quest petition), and a substantial prison sentence. See Haslip, 499 U.S. at 23 (stating that although the punitive damages award was more than four times the amount of compensatory damages, more than 200 times out-of-pocket expenses, and far in excess of the potential civil penalties for similar conduct, considering that imprisonment could result in the criminal context, the award "did not lack objective criteria" and was constitutional). As the Court finds that both Involuntary Petitions contained knowingly false statements, the punitive damages awarded herein are less than comparable criminal penalties that could potentially be imposed for similar conduct.

Based on the totality of the circumstances, and considering the Supreme Court's guideposts in awarding punitive damages, $600,000 of punitive damages is warranted.

**F.  Allocation of Liability for § 303(i) Award**

In addition to the discretion to determine whether a § 303(i) award is appropriate, the

bankruptcy court also retains the discretion to allocate liability for such an award among the

Petitioning Creditors.  In re Forever Green Athletic Fields, Inc., No. BR 12-13888-MDC, 2017

WL 1753104, at *9 (Bankr. E.D. Pa. May 3, 2017); Pyke v. Funnel Sci. Internet Mktg., LLC (In

re Funnel Sci. Internet Mktg., LLC), 551 B.R. 262, 276 (E.D. Tex. 2016).  In allocating liability,

the Court once again considers the totality of the circumstances.  Nat'l Med. Imaging, LLC v.

U.S. Bank, N.A. (In re Nat'l Med. Imaging, LLC), 570 B.R. 147, 168 (Bankr. E.D. Pa. 2017).  A

bankruptcy court may hold the petitioning creditors jointly and severally liable, or may assess

damages to each petitioning creditor in relation to their conduct.  Sofris v. Maple-Whirworth,

Inc. (In re Maple-Whitworth, Inc.), 556 F.3d 742, 746 (9th Cir. 2009) ("[A] bankruptcy court has

discretion to hold all or some petitioners jointly or severally liable for costs and fees, to

apportion liability according to petitioners' relative responsibility or culpability, or to deny an

award against some or all petitioners, depending on the totality of the circumstances.").

In Rosenberg, the bankruptcy court held that the term "'petitioner,' as used in [§] 303(i),

may be construed to include those agents and/or principals who sign the involuntary petition on

behalf of the creditors or who cause the petitioning creditors to file the petition." DVI

Receivables XIV, LLC v. Rosenberg (In re Rosenberg), 779 F.3d 1254, 1261 (11th Cir. 2015).

In affirming, the Eleventh Circuit found that that it was unnecessary to apply principles of

agency law, and the narrow question under § 303(i) is who "was in fact the actual petitioner here

and thus properly held liable under § 303(i)." Id.  The court upheld the decision to impose

liability upon a petitioning creditor that did not sign the petition, but authorized it to be signed, as

the petitioning creditors were essentially "intertwined." Id. at 1269.

There is ample evidence supporting the conclusion that the actions of the Petitioning Creditors were undertaken as an intertwined group, and as such damages should be assessed against them as a group.  (See 10/30 Tr. (Sprei) 96:6–8; 10/31 Tr. (Sprei) 45:10, 64:23–25.) With respect to Sprei's authority, the Petitioning Creditors testified as follows:

> Q.  … was this a document that you had told Mr. Sprei that he could be caused to be filed in your name with the bankruptcy court?
>
> A.  I gave permission to Mr. Sprei to file the involuntary bankruptcy petition.
>
> Q.  And that's including against Quest Funding as well as Anmuth, sir?
>
> A.  I don't remember -- he never told me the names.  He told me regarding the property DuPont, to try to get back that 4.7.  Whoever owned it.  I don't remember.  He didn't spell out its owned by this name, that name.  The owner of all the companies was named controlled by Joe Brunner.

(Leser Dep. Tr. 70:25–71:17.)

> Q.  … the objection that was filed…on your behalf…says that Sprei often acts on behalf of Miller and Lesser [sic] with respect to a variety of business ventures.  Is that a true statement, sir?
>
> A.  Yes, that's on behalf of me.

(10/30 Tr. (Miller) 71:6–11.)

> "I [Miller] relied on Sam [Sprei], what Sam [Sprei] told me to do, I did."

(10/30 Tr. (Miller) 74:15.)

> Q.  … I'm asking whether you were making decision that night [May 31] on behalf of the two other petitioning creditors?
>
> A.  Yes.

(10/30 Tr. (Sprei) 96:6–8.)

As Leser and Miller gave Sprei permission to act on behalf of the group, they cannot "simply turn a blind eye, expecting willful ignorance to protect [them]."  In re Meltzer, 535 B.R. 803, 818 (Bankr. N.D. Ill. 2015).  They must "bear the responsibility for having allowed [Sprei] to file and prosecute an irresponsible, abusive involuntary petition in [their] name."  Id.  Based

on the totality of the circumstances, the Petitioning Creditors are jointly and severally liable for all damages awarded.

## G.  Nunc Pro Tunc Relief

The Alleged Debtors request that the Involuntary Petitions be dismissed nunc pro tunc to the date of filing.  The Bankruptcy Code permits a bankruptcy court to fashion relief so as to undo the effects of a petition filed in bad faith.  In re Cent. Park Estates, LLC, 485 B.R. 72, 76– 77 (Bankr. S.D.N.Y. 2013).  Because an award of damages does not sufficiently remedy the effects of these improperly filed Involuntary Petitions, dismissing the Involuntary Petitions nunc pro tunc to the dates on which they were filed is appropriate.  Id.  This relief is particularly appropriate here, where the business of the Alleged Debtors involves investing and lending in real estate, and financial disclosures may be necessary to this business.   Additionally, the Petitioning Creditors consent to nunc pro tunc relief.[26]  Accordingly, the Involuntary Petitions will be dismissed nunc pro tunc to May 31, 2018 and June 4, 2018, respectively.

## H.  Injunction against Future Filings

The Alleged Debtors seek an order barring the Petitioning Creditors from participating in the filing of any involuntary bankruptcy petition in this district against Brunner, or any entity in which Brunner has an interest, without first obtaining leave of this Court.  The Petitioning Creditors do not object to this relief.  (10/31 Tr. 107:6−11.)

"The court has inherent power to sanction parties and their attorneys, a power born of the practical necessity that courts be able 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'"  Revson v. Cinque & Cinque, P.C., 221 F.3d 71, 78 (2d

---

[26] See July 24, 2018 Tr. at 9:24−10:7, Anmuth ECF No. 21.

Cir. 2000) (quoting <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 43 (1991)).  Litigants who file

frivolous, abusive papers "interfere with the orderly administration of justice." <u>United States ex</u>

<u>rel. Verdone v. Circuit Court for Taylor Cty.</u>, 73 F.3d 669, 671 (7th Cir. 1995).  Section 105(a)

grants the court authority to impose filing restrictions.  <u>In re Meltzer</u>, 535 B.R. 803, 821 (Bankr.

N.D. Ill. 2015) (citing <u>Kristan v. Turner (In re Kristan)</u>, 395 B.R. 500, 511 (1st Cir. BAP 2008)).

Restricting the future ability of the Petitioning Creditors to file anything in the

bankruptcy court for this district against Brunner, or one of his entities, for a period of two years,

without prior permission, is entirely warranted.


## IV.    CONCLUSION

For the reasons stated above, the Involuntary Petitions are dismissed <u>nunc</u> <u>pro</u> <u>tunc</u> to the

dates on which they were filed, and the Petitioning Creditors are barred from filing any petition

in the bankruptcy court for this district against Brunner, or any entity in which Brunner has an

interest in, without first obtaining leave of this Court, for a period of two years.  The Petitioning

Creditors shall pay to the Alleged Debtors $121,411.47 for attorneys' fees and costs, for which

the Petitioning Creditors are jointly and severally liable, and the Alleged Debtors may file further

application for additional fees incurred subsequent to October 24, 2018.  Punitive damages in the

amount of $600,000 shall be imposed on the Petitioning Creditors, for which they are jointly and

severally liable.  A separate order and judgment will be issued.

**Dated: Brooklyn, New York**
**March 27, 2019**

_____
**Carla E. Craig**
**United States Bankruptcy Judge**